(Decided February 27th, 1860.)

---

GEORGE R. DENNIS and JAS. MURRAY RUSH, Exc'r of ELIZABETH U. RUSH, *vs.* GEORGE R. DENNIS and JAS. U. DENNIS, Exc'rs of JOHN U. DENNIS.

A testator devised real estate to each of his two children, and bequeathed the balance of his personal estate, after payment of debts, to his brother *in trust*, during the minority of his children, to *appropriate* the profits thereof for *their use and benefit*. He then gave to his brother, during the same period, the entire profits of his real estate, upon trust for the same uses and purposes, with power to exercise, *any control or act of ownership over his said real estate, of which the testator himself was capable*, except selling the whole, or any part of it, or sell-

ing timber therefrom. He also gave to his brother the care of the persons and education of his children, with *power to sell any part of his personal estate,* and directed that great care be taken in the education of his children, and, to that end, that no expense be avoided, and no facilities, within reach of their income, withheld. He further directed that during the continuance of this trust, the profits of the real estate should be appropriated to the use of that one of his children who should be entitled to the estate itself. The real estate, so devised, consisted of several farms, and the personalty, for the most part, of a large number of slaves. Upon a bill filed by the *cestui que trusts* against the executors of the trustee, for an account of this trust. HELD:

1st. That under the terms of this will, the trustee was not bound to *rent* the lands and *hire out* the negroes, but had authority to have the lands *cultivated,* for the benefit of the *cestui que trusts,* by means of the negroes and other personal property belonging to the trust estate.

2nd. The trustee having so cultivated the larger portion of the trust real estate, he is responsible only for the issues and profits arising from such *cultivation management,* and not on a basis of a *renting* of the lands and *hiring out* of the negroes.

3rd. The complainants must prove the *net annual* proceeds of the lands so cultivated; the evidence cannot be very exact, but the best the nature of the inquiry admits of should be furnished; farmers of experience who have long known the lands may give *opinions* of their probable annual products, and the expenses of cultivating them.

4th. The trustee is responsible for the values of all slaves, or their increase, belonging to the trust, sold by him, including *interest* from the time of sale, and for all such slaves living at the termination of the trust and not delivered over to the *cestui que trusts.*

5th. The trustee should not be charged with *compound interest* upon any portion of the trust estate, but the *cestui que trusts* should be allowed *simple interest* upon the excess of the annual products over the annual expenses, such allowance, upon each annual excess, to commence at the end of one year after the accrual thereof.

A bill by *cestui que trusts* against their trustee, in its *special prayer* for relief, called for an account, upon the hypothesis that it was the duty of the trustee to rent the lands and hire out the negroes, constituting the trust property. The prayer for general relief was, "*and* that your orators may have such other *and* further relief," &c. The proof shows that the trustee rented a small portion of the lands and received the rents, but *cultivated* the larger portion thereof, *as he had a right to do,* with the negroes and other trust property. HELD:

1st. That under this bill the complainants are entitled to an account, both for the rents received for the lands rented, and for the *issues and profits* arising from *the lands cultivated.*

2nd. Where *cestui que trusts* claim rents received by their trustee from a portion of the trust estate, and also the issues and profits received from

the cultivation of other portions, such claims are not so *materially inconsistent* as that the issues and profits from cultivation cannot be claimed under such a *general prayer* as this.

Every material fact to which the plaintiff means to offer evidence ought to be stated in the bill, but a general charge or statement of the matter of fact, is sufficient, and it is not necessary to charge minutely all the circumstances which may conduce to prove the general charge.

The bill must show the plaintiff's title and interest in the subject-matter of the suit, and also that the defendant has an interest in the subject-matter and is liable to answer therefor to the plaintiff.

An account of a trust kept by a deceased trustee, commenced in 1834 and ended in 1851, and included items in each of these years and in every intervening year. The *cestui que trusts* brought suit in 1853, about four years after the elder, and one year after the younger, *cestui que trust* came of age, and between one and two years after the death of the trustee. Many of the charges in the account do not state to whom they were paid, and in many instances, the charges, and in some, the credits, are *blended,* so as to render it impossible to determine to which of the *cestui que trusts* they are applicable or belong, and the irregular manner in which it was stated, as to *dates,* does not furnish intrinsic evidence of its being an original account kept and stated, from time to time, as the transactions of the trust were occurring. There was no proof of its being an account *stated* or *settled* between the trustee and the *cestui que trusts*. HELD:

1st. That this account cannot be received as *prima facie* correct, and as casting upon the complainants the *onus* of impeaching it.

2nd. But if the *cestui que trusts* rely upon the *credits* therein contained, they will admit in evidence the *charges,* unless they discredit or disprove them.

As a general rule a trustee should keep separate accounts, as far as practicable, where two or more *cestui que trusts* have separate interests.

An agreement admitted unqualifiedly a *specified class of items* in an account of a trust, and after rejecting absolutely two items, in reference to others, dispensed with the necessity of proving the execution of bills and receipts of the persons to whom payments profess to have been made, allowing them to have the same effect, and no more, as if offered in evidence and the execution of them proved. It then provides that the complainants shall not be understood as admitting that any items of the account save those unqualifiedly admitted, "are proper charges against the trust estate and legal and competent evidence in this cause, or that said account is a proper or any account of the trust created by the will." The account contains many items which do not indicate to whom they were paid. HELD:

1st. That this agreement is not such an admission and adoption of the account as to make it *prima facie,* a correct account of the trust.

2nd. But it is sufficient to charge the trust estate with all such items as were properly applicable to the purposes of the trust, which show to whom they were paid and the cause and purpose thereof.

Admissions made by express agreement of the parties, in order to dispense with other proof, are not to be extended, by implication, beyond what is expressed in the agreement.

An executor by paying debts and legacies beyond the amount of cash received from sales, cannot thereby transfer to himself, in his own right, the title to any portion of the testator's property.

But where a court of equity is called upon to pass a decree recognising the correctness of this proposition, care will be taken to provide that the executor shall be reimbursed out of the testator's property for all proper disbursements, on account of the estate, appearing to have been legally made by him.

A bill by *cestui que trusts*, charging that the trust estate had been impaired, injured, decayed, or wasted in consequence of the trustee's neglect and want of proper care and diligence, is not sufficient to sustain a claim for *cutting and selling timber* from the estate, and no recovery can be had therefor the *answers being silent* on the subject, and exceptions having been filed to the bill on that account.

When a cause is remanded, under the Act of 1832, without reversing or affirming the decree, the case stands in the court below as if no appeal had been taken, and the decree appealed from had not been passed.

But in such a case, the opinion of the Court of Appeals, on points made before that tribunal, or which may be presented by the record, is to control and regulate the subsequent proceedings in the the cause.

Accounts and statements made in a cause by the auditor in accordance with instructions of the parties, both as to principles and details, do not require exceptions, but are subject to objections, if no exceptions to them are filed.

Cross-appeals from the equity side of the Circuit Court for Somerset county.

The bill in this case was filed on the 4th of April 1853, by George R. Dennis, of Littleton, and Elizabeth U. Dennis, against George R. Dennis and James U. Dennis, executors of John U. Dennis, for an account of certain real and personal property, and of the annual values thereof, which had been devised by Littleton U. Dennis, the father of the complainants, to his brother John U. Dennis, the defendant's testator, *in trust* for the benefit of the complainants. The allegations of the bill and answer, the facts of the case, and the opinion

and decree of the court below (SPENCE, J.) are sufficiently stated in the opinion of this court.

During the progress of the cause in the court below, the complainant, Elizabeth U. Dennis, intermarried with J. Murray Rush, who was made a party complainant, and subsequently, upon the death of his said wife, he, as her executor, was made a party complainant. Both parties appealed from the decree of the court below.

The cause was argued before LE GRAND, C. J., ECCLESTON, TUCK and BARTOL, J.

*J. W. Crisfield* and *Wm. S. Waters* for the complainants.

1. *There is before the court no account of this trust ?*

This proposition is true, unless the account J.U.D., filed with the supplemental answer, and with the auditor as evidence, is properly before the court, and to be taken in this case as an account of the trust. The bill charges that neither the trustee nor the defendants ever accounted, and prays that an account may be taken under the direction of the court. No answer under oath is asked. The answer, not sworn to, alleges that the trustee kept an annual account of issues and profits, but does not set it out. It also alleges that the defendants have always been ready to come to an accounting with the complainants, but that no specific claim had ever been presented to them. The supplemental answer, not sworn to, exhibits J.U.D. as a copy of the account referred to in the answer, and tenders the use of the original, alleging that the original is in the handwriting of the trustee. Both these answers are met by the general replication, which was put in in due time. 8 *Gill,* 171, *Md. & N. Y. Coal & Iron Co. vs. Wingert.* 2 *Daniell's Ch. Pr.,* 971, 960. A book containing J.U.D., was filed with the auditor as evidence, and this is claimed to be the original kept by the trustee. The complainants have filed exceptions to this book as evidence. There is an agreement of solicitors in reference to some of the items named in this account, which will be

more particularly referred to hereafter. This is all that the record discloses upon this subject.

It is evident that J.U.D. is not an account stated. 2 *Younge & Jervis*, 37, *Attorney General vs. Brooksbank.* 2 *Atk.*, 399, *Burk vs. Brown.* 1 *Daniell's Ch. Pr.*, 761. It not being an account stated, the court must be satisfied by legal evidence that it contains the true receipts and disbursements of the trust, in order that it should be entitled to any consideration. There is no evidence in the record sustaining this account, and to allow it any importance in deciding this case, would establish the principle, that when a trustee is sued for an account, he can discharge himself by his own unsustained statements. It is the right and privilege of complainants to call for books of accounts of defendants, to charge them; but defendants, unsolicited, cannot produce any account kept by themselves, to discharge themselves, except it be an account stated. 1 *Bac. Abr., Tit. Account.* 1 *Story's Eq.*, secs. 443, 450. *Alex. Ch. Pr.*, 126. If the complainants had called upon the defendants to account generally, and required the answer to be under oath, and the defendants had answered under oath, and set up J.U.D. as their account, upon general replication it would not have been evidence; all its statements would have been put in issue. 13 *Ves.*, 53, *Ormond vs. Hutchinson.* 1 *H. & G.*, 80, *Ringgold vs. Ringgold.* 6 *Gill*, 269, *Magruder & wife vs. Darnall & wife.* 2 *Johns. Ch. Rep.*, 90 *Hart vs. Ten Eyck.* When a particular book or paper, containing an account, is called for, either by the bill or by interrogatories before the master, it has been held that upon its production in response to such bill or interrogatory, it is evidence. 17 *Verm.*, 61, *Allen vs. Mower.* 7 *Ala.*, 582, *Powell vs. Powell.* 8 *Gill*, 391, *Barnes & Fergusson vs. Compton.* This account, J.U.D., is not admissible upon either of these principles.

It is not admissible upon the grounds stated by the court below? It is there said this account "should be received by the court as an account of the rents, issues and profits of the trust estate, and of disbursements on account thereof, because

of agreement, No. 2, filed in the cause." This agreement was made by solicitors for the purpose of saving the expense, trouble and delay of other testimony. Such agreements are encouraged by courts, but they are never extended by implication beyond what is expressed. They do not stand in the position of proven declarations of the parties to the case. 1 *Greenlf. on Ev.*, sec. 186. 3 *Greenlf. on Ev.*, secs. 292, 293. 1 *Camp.*, 70, *Goldie vs. Shuttleworth.* 1 *Hare*, 15, *Mounsey vs. Burnham.* 1 *Molloy*, 350, *Fitzgerald vs. O'Flaherty.* The agreement, however, does not need the protection of this rule. It stipulates, "that in every account which may be taken in this cause, the defendants shall be credited with all charges for taxes paid," &c., contained in the account, J.U.D. It then stipulates further, "that the other items, charged in said account, should be considered and treated as the bill and receipts of the persons to whom said payments profess to have been made, would be, if the same were produced and offered in evidence, and the execution of the said receipts proved, and liable to all such exceptions, as such bills and receipts would be liable to, if the same were offered in evidence." If the agreement ended here, it would carry no implication that the accounts of the rents, issues and profits of the trust estate, contained in J.U.D., were true as therein stated. But the agreement proceeds—"provided, that, in making this agreement, it shall not be understood as waiving any claim set up by the bill, or as admitting the propriety of the trustee's management of the trust, or that said items, or any of them, except those hereby unqualifiedly admitted, are proper charges against the trust estate, and legal and competent evidence in this cause, or any account of the trust created by the will and set forth in the bill." This paper simply agrees to inserting in any account to be taken, certain items found in J.U.D.; it admits that other items shall have a particular effect as evidence, and precludes expressly any implication favorable to the defendants from such admission. It is not an admission that any disbursements, to which it refers, were ever actually made, much less that statements in the accounts to which it does not refer are true.

The second reason assigned, by the court below, why this account should be received, is, "that the trustee died before the expiration of the term or period of the trust, and before he could have a settlement of the trust with the *cestui que trusts*, the said account being in the handwriting of the testator, and bearing intrinsic evidence of having been kept by him, and intended as an account of the products, proceeds and expenses of the trust estate." These reasons seem to be so combined as to constitute one only. Let the proposition be put stronger. Can it be maintained that if a trustee *dies* before the termination of his trust and leaves a book of accounts, in his own handwriting, which is *proven* to have been kept and intended by him as an account of the trust, that such a book is to be evidence to limit amounts by which he is to be charged and discharged? Where does such a rule of evidence come from? If it *be* true, trust estates are entirely at the disposal of trustees, and by entries in books in their handwriting, and which *they* intended as an account of the trust, in the event of their death before a settlement, they may withhold all the profits from the *cestui que trusts*. The effect would be the same if such entries were evidence of the receipts and not of payments. It would only be necessary for the trustee to diminish his entries of receipts, by amount of such payments as they could not prove. What possible effect can the death of a trustee have upon the books as evidence? It is only a question between the right of the trustee to appropriate the proceeds to himself, in his life time, and his right to dispose of them by last will. If this proposition is true, and is so affirmed to be by this court, it will silence all litigation on the subject of trustees' accounts. 1 *H. & G.*, 82, *Ringgold vs. Ringgold*. 5 *G. & J.*, 134, *Owings, et al., vs. Low*.

But the facts assumed by the court below, in reference to this account, are not true. The trustee might have had a settlement of his trust in his lifetime. He could and ought to have given bond, as guardian, and accounted yearly with the orphans court. *Act of* 1816, *ch*. 203. He could have applied to a court of equity and there have administered his

trust. No trustee ought to conduct a trust for so long a time without an account. 1 *Amb.*, 406, *Brooks vs. Oliver.* Again, there is no evidence in the record that J.U.D. is in the *handwriting* of the trustee, or that it was ever seen by him. If there is any peculiarity in the book, it is no where described in the record, and the fact that the judge had the book before him, and inspected it, and said it was in the trustee's *handwriting*, cannot be taken as *evidence* of the fact. 11 *Md. Rep.*, 26, *Cherry vs. Stein.* There is no proof of its history, where it came from or what is its genealogy. Again, the account does not bear intrinsic evidence of its having been kept by the trustee and intended as an account of the trust, but, on the contrary, shows upon its face that it was never kept as an account of this or any trust. The entries were never made there, from day to day, as the events occurred, but were at given times, or all at one time, drawn from other sources and placed there. There is nothing to show whether the several items were taken from another book, from the memory or imagination of the trustee, or placed there by some one else. The charges and credits are blended, whilst the will directs that the profits of the real estate of each *cestui que trust* shall be kept separate. No account should be considered as bearing mark of being kept as an account of this trust in which this provision is ignored; of this, however, more hereafter. The proof shows that negroes were sold and timber cut, yet nothing of this appears in the account. The vouchers filed differ from the items in the account, and there is nothing mentioned in the account of the various items of personal property, sold during the trust, a part of which has been proven. All this directly impeaches the account. The indirect impeachment of its correctness is equally strong. It is susceptible of demonstration that there would have been a larger net balance accruing to the *cestui que trusts*, if the negroes alone had come to the trustee's hands, and been hired out by him, and all proper expenses of the trust paid out of the proceeds, than is shown to be due them by J.U.D., from the whole estate. Its correctness is further impeached by another consideration; for the first

11      v.15

six years of the trust the surplus profits are shown by it to be
$9051.93, for the next six years $561.79, and for the re-
maining four years there was an excess of expenditures over
income of $2078.70.   The evidence, so far from explaining
this, shows that the productiveness of the land was not di-
minished, and that the number and value of the negroes in-
creased.     As to this, see 2 *Story's Eq.*, sec. 1355; 3 *H. &*
*J.*, 347, *Pottenger vs. Steuart; Ibid.*, 251, *Spedden vs. The*
*State;* 2 *McCord's Ch. Rep.*, 58, *M'Dowell vs. Caldwell.*
Its correctness is further impeached by the whole testimony
in the case.   It is impossible to believe from the value of this
property, as disclosed by the testimony, that the profits are
as stated in this account.

We will now refer to the effect of the agreement, No. 2,
upon the charges in J.U.D.   Some of them, in any account
to be taken, are to be charged against the *cestui que trusts*
absolutely.   They are charges for "taxes paid, repairs to
buildings, medical bills, board, clothing, tuition, and other
personal expenses of the *cestui que trusts*."   The complain-
ants are disposed to admit, absolutely and without question,
every charge of that kind.   To the other items the com-
plainants have, as provided for in the agreement, filed excep-
tions.   These items are composed of, 1st, such as do not pro-
fess to be paid to any particular individual; 2nd, such as pro-
fess on their face, or show, that they relate to this trust.   It is
believed there are none that come within this description ex-
cept by inference; 3rd, such as neither appear upon their face
nor are shown by other testimony to have reference to this
trust.   The great body of these items are within this class.
Suppose bills of such were produced, and receipts from per-
sons to whom paid were produced, and full testimony besides
that they were paid, they could not be received.   In refer-
ence to all the items, it may be said, 1st, it should appear
to whom, for what, and when paid, and that they were
paid on account of the particular trust.   8 *Gill*, 391,
*Barnes vs. Compton.*   2nd.  That the receipts, if pro-
duced and proven, would be only evidence before the
auditor, but as exceptions have been taken to them, they

must be rejected by the court. *Alex. Ch. Pr.*, 125, 141, 142. *Gresley's Eq. Ev.*, 174, 176. 3 *G. & J.*, 25, *Owens vs. Collinson.* 2 *H. & G.*, 458, *Maccubbin vs. Cromwell.* 7 *G. & J.*, 212, *Kent vs. O'Hara.* 1 *Bland*, 91, *Strike's case. Ibid.*, 433, 434, 441, *Williamson vs. Wilson. Ibid.*, 471, *Dorsey vs. Hammond.* 3rd. The items do not show to which, if either of the *cestui que trusts*, they are applicable. The court cannot act upon the principle of dividing them equally. It may here also be said that the produce of the farms are also blended. Newbold is in common, Essex divided in severalty, and White Haven and Annamessex in severalty; yet all of Essex and Newbold are blended together, and even Essex and Annamessex also. It is the duty of a guardian or trustee, under all circumstances, to keep separate accounts against each *cestui que trust.* 12 *G. & J.*, 108, *Hatton vs. Weems.* 8 *G. & J.*, 218, *Jenkins vs. Walter.* 1 *H. & G.*, 70, *Ringgold vs. Ringgold.* 8 *Sergt. & Rawle*, 12, *Baker vs. Richards.* 4 *Ves.*, 418, *note* to *Hardwicke vs. Vernon.* 15 *Ves.*, 437, *Lupton vs. White.*

But it is urged, on the other side, that this account is admissible, upon the ground that it is an *old document*, and certain authorities are cited to sustain this position. These authorities all refer to the case of *Chalmer vs. Bradley*, 1 *Jac. & Walk.*, 65, a case which is entirely unlike this, for those accounts and vouchers admitted were of nearly *thirty years'* standing, and in other respects it materially differs from this. In no view of it, and upon no principle, can this account be regarded as an *ancient document*, and entitled to credit *as such.*

It is believed that the foregoing considerations will establish our first proposition and show that J.U.D. is not before the court, or any of the items thereof, except those absolutely admitted.

*2nd. There being no account before the court of this trust, the proper mode of taking the account is that adopted by the complainants in their accounts.*

In these accounts, the trustee is charged with interest on the value, as shown by the inventory, of the personal estate

other than negroes, and with the *annual values of the negroes and land,* as shown by evidence. Any account with the trustee involves the necessity of an account upon this basis, *whatever may have been his mode of management.* He must appropriate the profits of each portion of the real estate to the *cestui que trust* to whom it belongs. The negroes, personalty other than negroes, are held in common. The two divisions of Essex, White Haven and Annamessex, are held in severalty. These portions of real estate are of unequal value, and require an unequal amount of capital to manage them. The common property was used to carry on the separate property. To find the profits of a particular farm, you must deduct the expenses of raising the crop from the receipts. Suppose the real estate of one of the *cestui que trusts* require more negroes and farming capital to work it than the other, it would be impossible to ascertain, from receipts, the amount due to each *cestui que trust.* Resort must be had to annual values. The annual value of real estate is, that which could be made from it after paying all expenses of cultivation. Rent would be less, because the lessee could not be expected to pay all for rent and make nothing. The powers and discretion given to the trustee, however large they may be considered, cannot affect the mode of stating the account. The trustee is responsible for the use of his discretion; he is responsible for a sound discretion and reasonable diligence and care; and it is to be presumed that he used it; and, therefore, in whatever mode he managed the trust estate, he made from it what ought to have been made. *Hill on Trustees,* 482, 488, 489, 494. *Willis on Trustees,* in 10 *Law Lib.,* 57, 58, 59, 81. 5 *Ves.,* 794 *Pocock vs. Reddington.* 6, *H. & J.,* 479, *Darne vs. Catlett.* 16 *How.,* 541, *Barney vs. Saunders, et. al.* The mode of management adopted by him is not shown to be less productive than any other; and, in the exercise of a sound discretion, he could only be justified in adopting it upon the ground that it was as profitable as any other. This mode of stating the account, by charging the defendants with the annual values of property, is the only mode in which the

trustee could be charged, or has ever been charged, where there is *no account*. When the trustee keeps no account, and it is impossible to say what he has received, it is only by showing what the *rents, issues* and *profits* of the property were, that his responsibility can be fixed, for these are what, in contemplation of law, he received. In the South Carolina case of *Huson vs. Wallace,* 1 *Richardson's Eq. Rep.,* 1, cited on the other side, an account was *annually* settled with the *ordinary.* Here there is no account, and the trustee must be charged with the *annual values* of the property. 6 *Gill,* 269, *Magruder & wife vs. Darnall & wife.* 1 *H. & G.,* 80, *Ringgold vs. Ringgold.* 12 *G. & J.,* 108, *Hatton vs. Weems.* 2 *H. & J.,* 483, *Hall vs. Griffith.* 3 *H. & J.,* 355, *Pottenger vs. Stewart.* 1 *H. & G.,* 230, *Drury vs. Conner.* 9 *G. & J.,* 161, *Wilson vs. Negro Ann Bennett.* 12 *G. & J.,* 288, *Lee vs. Pindle.* 2 *H. & J.,* 329, *Davis vs. Walsh.* 4 *Ves.,* 411, *Hardwicke vs. Vernon.*

In the account, the complainants charge the trustee with the annual interest on the personal estate, other than negroes, from the date of the distribution. This property is then considered as cash at the appraisement. No provision in the will can make the duties of the executor different from those required by law. Before the trustee took possession of the property, as trustee, he had duties as executor to perform. The trust is declared after the executors "shall pay debts and settle the personal estate." *Hill on Trustees,* 237. The executor has no right to retain property of the deceased and pay off debts, and, if he does this, he should be charged with the property at the appraisement. He should, in all cases, sell enough to pay debts. 2 *H. & J.,* 483, *Hall vs. Griffith.* 7 *H. & J.,* 17, *Haslett vs. Glenn.*

We will now consider the mode in which *interest* is charged in these accounts. Upon the subject of charging trustees with interest, courts have adopted, in modern times, rules entirely inconsistent with the old authorities. Until after the time of Charles II., no instance occurred of charging a trustee with interest. Even in the times of *Lord Hardwicke,* an executor was not chargeable with interest,

who used money of the estate for his own benefit. 3 *G. & J.*, 342, *Diffenderffer vs. Winder.* The modern ideas on this subject, in this country and in England, have been adopted in view of the change which the world has undergone —money has been more in demand—investments can, at any time, be made, safe and profitable, and, if not made, it is because the party holding the money does not desire to make them. It is the duty of the guardian and trustee, as recognized in all the authorities, to put out, or invest, all the *cestui que trust's* money, or convert it into good and productive securities, and not suffer it to be idle, or use it himself. He can only retain to meet the exigencies of the trust. 2 *Kent*, 231. *Hill on Trustees*, 375. 2 *Story's Eq.*, secs. 1269, 1275, 1277, 1278. *Alex. Ch. Pr.*, 237. 1 *Johns. Ch. Rep.*, 620, *Schieffelin vs. Stewart.* 2 *Brown's Ch. Rep.*, 616, *Foster vs. Foster.* 1 *Johns. Ch. Rep.*, 508, *Dunscomb vs. Dunscomb.* 2 *Wend.*, 87, *De Peyster vs. Clarkson.* 1 *H. & G.*, 77, *Ringgold vs. Ringgold.* 3 *G. & J.*, 328, *Diffenderffer vs. Winder.* 2 *H. & J.*, 329, *Davis vs. Walsh.* 10 *G. & J.*, 182, *Comegys vs. The State.* 1 *Ves.*, 452, *Note 4* to *Tew vs. Winterton.* 12 *G. & J.*, 304, *Lee vs. Pindle.* 13 *Mass.*, 232, *Wyman vs. Hubbard.* 3 *Atk.*, 274, *Hicks vs. Hicks.* 11 *G. & J.*, 205, *Chase vs. Lockerman.* 1 *Ball & Beatt.*, 230, *Dawson vs. Massey.* 5 *Rawle*, 334, *In re. Harland's accounts.* 3 *Munf.*, 40, *Sheppard vs. Starke & wife.* *Hopkin's Ch. Rep.*, 424, *Clarkson vs. De Peyster.* 8 *Sergt. & Rawle*, 12, *Baker vs. Richards.* 4 *Sergt. & Rawle*, 116, *Say's Ex'ers vs. Barnes.* 1 *Binney*, 194, *Fox vs. Wilcocks.* 1 *Jac. & Walk.*, 140, *Pearse vs. Green.* The same authorities show, conclusively, that, upon a failure to discharge this duty, the trustee will be charged, at least, *simple interest* on all balances in his hands, from the time of their reception. Several considerations form the basis of this rule: 1st, the trustee can derive no benefit from the trust, but it must enure to the *cestui que trust;* 2nd, it must be presumed that if the trustee does not invest the money, and has not marked it, so as to indicate where it is, that he used it himself, and

made profit from it, and that the interest is to be deemed the measure of that profit; 3rd, it being clearly the trustee's duty to invest, if he fails to discharge a clear duty, he should place the *cestui que trust* in the same position as if he had discharged such duty. In the application of these principles to this case, it will be seen that, at least, *simple interest* upon the yearly balances should be charged against the trustee. The only thing that could prevent the operation of this rule, would be the fact, that the money retained by him was necessary for the exigencies of the trust, and that, in the circumstances of this case, forms no excuse, even if the account should be stated upon the basis of J.U.D.

The only question, then, is, whether *compound* interest should be charged? Compound interest, like simple interest, is given for a failure of duty on the part of the trustee. In 2 *Kent*, 231, Chancellor Kent says: "If a guardian neglects to put out his ward's money, with the same care as his own, or, for an unreasonable time, suffers it to be idle, or uses it, the court will charge him simple interest; and, in case of gross negligence, compound interest." The considerations upon which compound interest is given, are the same as those upon which simple interest is given, as before stated. In addition to the authorities there cited, see, on this point, 6 *H. & J.*, 482, *Darne vs. Catlett.* 11 *Ves.*, 103, *Raphael vs. Boehm*, and same case in 13 *Ves.*, 407. 12 *Ves.*, 127, *Dornford vs. Dornford.* 18 *Pick.*, 1 *Boynton vs. Dyer.* 2 *McCord's Ch. Rep.*, 202, *Wright vs. Wright.* 5 *Johns. Ch. Rep.*, 516, *Everston vs. Tappen.* 2 *Dev. & Batt. Eq. Rep.*, 60, *Spack vs. Long;* and same case in 1 *Ired. Eq. Rep.*, 426. In England, there is a stage between the ordinary interest charged in the court of chancery, and compound interest. Not so here. 1 *Brown's Ch. Rep.*, 335, *Treves vs. Townshend.* 1 *Jac. & Walk.*, 122, and the case cited from *Hopkin's Ch. Rep.*, 424. Compound interest is given where there is an express direction to *accumulate*, and there is a breach of it. (See the cases cited from 11 *Ves.*, 103, and 3 *G. & J.*, 311.) No distinction, in principle, can be drawn between an express trust to accumulate, and one

where the law directs an accumulation, as in trusts for *infants.* The law presumes a trustee to know his duty. This trust, both as being a trust *for infants,* as by the terms of the will, is one in which it was the duty of the trustee to *accumulate.* See, on this point, in addition to the cases already cited, *Hill on Trustees,* 404. Another ground upon which compound interest is charged, is, even where there is no express direction to accumulate, the trustee has used the money in his business, and subjected it to hazard. The object is to reach the presumed profits, or to prevent the hazard to which funds are subjected in remaining in the trustee's hands. The cases already cited fully sustain this position. See, also, 3 *Merivale,* 38, *Fairlie vs. Fairlie.* 1 *Ves.,* 89, *Note* 2 to *Hilliard in Bankruptcy.* 1 *Ves.,* 156, *Chumley, Ex-Parte.* The question then, is, did the trustee use the money in his own business, and subject it to hazard in so doing? If not, this is a question of evidence; and the facts in this case show that the trustee did use the money in his own business, and that it was subjected to all the hazard of his own private fortune. Gross negligence in the management of the trust, and improper conduct in refusing to account, and failing to keep accounts, will subject the trustee to compound interest. From these considerations, and all the facts of the case, we think the accounts, in so far as they charge this trustee with compound interest, are correct.

3rd. *There are sufficient averments in the bill upon which to recover against the trustee, whatever may have been his mode of managing the trust.*

The bill sets forth the title of the complainants to the property under the will of their father; sets forth accurately the trust vested by the will in the defendants' testator; that the trustee accepted the trust; states the time when he entered upon his duties, and the time when the trust terminated; that during all that time he had possession of the trust property, and received the rents and issues and profits thereof; that the complainants do not know the precise amount received, but charge, in respect to the particular proceeds of the property, that they were of great annual value, and what that value

was. The bill further charges the death of the trustee, the appointment of the defendants as his executors, their acceptance of the trust, and their possession of assets, the demand for an account, the failure of the deceased trustee and the defendants to account, and prays for the taking of an account. Upon these allegations alone the complainants are entitled to an account, whatever course may have been pursued by the trustee in the management of the trust. It is only necessary that the bill should state the title of the complainant in the subject matter, the interest of the defendant in it, and his liability thereon. *Story's Eq. Pl.*, secs. 260, 261, 262. The title of the complainants is stated, the interest of the defendants in the subject matter is stated, and the failure to account is stated, and the liability to account arises out of these facts as stated, as a matter of law. This is all that is necessary in a bill for an account against guardians and executors. It is not incumbent upon the complainants to state how each parcel of property was managed. In this case such a requirement could not be met. The trustee rented out part of the land and worked others with the negroes. How could it be possible for *cestui que trust* infants to know each particular management? It is not necessary that every *fact* should be minutely stated in the bill. *Story's Eq. Pl.*, secs. 24, 37, *note*, 35, 256. 1 *Ves., Jr.*, 289, *East India Co. vs. Henchman.* 2 *Bland*, 51, *Townshend vs. Duncan.* 3 *Wilson*, 94, *Godfrey vs. Saunders.* 2 *Wash. C. C. Rep.*, 482, *Jordon vs. Wilkins.* *Willes*, 208, *Wheeler vs. Horne.* The bill does set out that the farm should have been rented out, the negroes hired out, and the personal property, other than negroes, sold and invested. This is, of course, matter of law. It is a statement of what was the legal duty of the trustee. It need not have been stated, for it is not the province of a bill to state matters of law, but matters of fact. The party recovers upon the facts, and if the statements of law are wrong, the facts are sufficient.

The averments of the bill are also sufficient to allow the complainants to recover for the timber cut. When this timber was severed from the freehold it became personalty and

the obligation to account for it became fixed, and upon the allegations which make the trustee liable for an account, he is liable for this lumber. It is not for the trustee to say, in such a case, that my conduct was not within my duty, but a breach of the trust. It is charged in the bill that when the estate came to the hands of the trustee, it was in good condition; that during the continuance of the trust it was greatly impaired in value, and when received from the trustee by the *cestui que trusts* they found the real estate greatly wasted and injured; that the trustee did not use proper care and diligence in preventing it; that they are entitled to compensation for such waste and decay; that the real estate was so injured to the amount of $10,000; and the bill then prays for an account of waste and injury to the real estate of the complainants. But suppose there are not sufficient allegations in the bill to cover the timber cut. Yet, for the purpose of doing justice, forasmuch as this money has been traced to the trustee, the court will consider that such money as the trustee has paid for Geo. R. Dennis, the *cestui que trust,* from whose real estate this timber was cut, during the trust, shall be taken from the proceeds of the timber. 1 *H. & G.,* 74, *Ringgold vs. Ringgold.*

*Isaac D. Jones* and *Wm. Tingle* for the defendants.

1st. The evidence shows that the trustee managed the trust property by cultivating the real estate with the trust slaves and stock, under good overseers, and, as far as practicable, with his own personal superintendence; that he managed it with care and diligence, and in the same mode in which he managed his own similar property, being the same pursued by the testator in his lifetime, and by his father before him, from whom he derived the estate; that the trust real estate was kept in good repair and condition; that there was no waste, negligence or mismanagement, on his part, and when he delivered up the property, the real estate was in as good, if not better, condition, as when he took it, and the negroes greatly increased in number and value.

By the terms of the will creating the trust the largest *dis-*

*cretion* was given to the trustee.    As to the personal estate, his discretion and power were unlimited, save by the interest of the children, the beneficiaries of the trust, for he had power *to sell* any part of the *personal property*.    So with regard to the profits of the *real estate*—he was vested with the discretion and power to exercise every control and act of ownership over it, that the testator himself could, except the power of selling it and cutting timber from it.    The care and custody of the persons and education of the infant *cestui que trusts* were also confided to the discretion of the trustee, with the direction that they should be thoroughly educated, and that, for that purpose, no expense within reach of their income should be spared.    With this large discretion, thus vested in him, the trustee accepted the trust and proceeded to execute it, and *died* before its completion.    In such a case, a court of equity will give great indulgence to the trustee in regard to the evidence by which he is to be exonerated, as we shall hereafter show.    The bill alleges that it was the duty of the trustee, under this will, to *rent* out the lands, to *hire out* the negroes, and to convert into money all the other trust property and invest it, and calls upon the defendants to account as for a *breach of this duty;* that is, upon a leasing, hiring and investing basis.    The defendants, in their answer, insist that the trustee was not required to account upon *that basis;* that he conducted the trust upon a *cultivation management,* and that on this basis they are willing to account.    The first question, therefore, is, which was right?

We have already referred to the *ample discretion,* in every particular, given to the trustee by this will, and in such a case, a court of equity will not, in the absence of fraud, interfere to control a trustee acting *bona fide* in the exercise of such a discretion.    *Hill on Trustees,* 735, (3rd. Am. Ed.)    In every case where it is shown that a trustee has duties to perform, the court will *prima facie* presume that he performed them *faithfully,* and the *onus* is on those who impeach him, to show, by clear proof, a breach of that duty. 7 *G. & J.,* 167, *Maccubbin vs. Cromwell.*    The trustee, in this case, found the trust property as the father of these *cestui*

*que trusts* had invested it, and the inference was that it was to be cultivated and managed in the same way as their father had cultivated and managed it. It was the management which was contemplated by the will, and which it was incumbent upon the trustee to pursue. This management the trustee pursued, and, in so acting, we insist that he *did right.* Here, as the proof shows, there were some seventy or eighty negroes, of whom some were *crazy,* some *afflicted,* some *old,* and some *young.* Were these to be torn from their old homes, separated from their families, scattered through the country and *hired* out to *new masters?* Such a proceeding would have shocked the public sense; and will a Maryland court decide, that it is the *duty* of a Maryland trustee—a Maryland gentleman—so to act in such a case as this? As a matter of *profit* the course pursued by the trustee was right. The proof shows that the lands at the time he received them were in a reduced state; what would have been their condition at the termination of the trust, if they had been rented out to unsparing and impoverishing tenants? They would have rented for but little, and it cannot be doubted but that the trustee pursued, as a matter of profit, the proper course in keeping the negroes—some of whom, from their age, were an incumbrance upon the estate—at their homes, and cultivating the lands by their labor, and carrying on the farms as usual. The children, these *cestui que trusts,* lived with their uncle, the trustee, knew how the estate was managed, received possession of it from him, and, in this way, *acquiesced* in and *recognised* the propriety of his action in this respect. The defendants, therefore, confidently insist that the management of the trust estate, *by cultivation,* as set forth in the answer and in the evidence, was an honest exercise of the trustee's discretion, under the terms of the trust, and being so, that the trustee is responsible only for actual receipts and profits from such management. This position is sustained both by reason and authority. 8 *Gill,* 403, *Gray vs. Lynch & McDonald.* 1 *Richardson's Eq. Rep.,* 1, *Huson vs. Wallace.* 1 *Strobhart's Eq. Rep.,* 170, *Hext vs. Porcher.* 2 *Johns. Ch. Rep.,* 1, *Osgood vs. Franklin.* 2 *Story's Eq.,*

secs. 1271, 1272. *Willis on Trustees*, 181, in 10 *Law Lib.* 6 *G. & J.*, 171, *Evans vs. Iglehart.* *Act of* 1798, ch. 101, *sub-ch.* 6, *sec.* 12.

2nd. If the trustee is responsible only for actual receipts and profits, arising from his cultivation management of the trust, the next question is, whether the averments of this bill are sufficient to warrant an accounting upon that basis? The bill avers that it was the duty of the trustee to rent out the lands, to hire out the negroes, and to convert into money all the other trust property and invest it. The *default* charged is the *breach of this duty.* The prayer for relief is that an account may be taken of the *annual values* of the real estate and negroes, &c., "*and* that your orators may have such other *and* further relief in the premises, as may be just and proper, according to the nature of their case." This averment of *duty and breach* alleged in the bill, the answer denies, and avers that the *management by cultivation* was an honest exercise of the power vested in the trustee in the creation of the trust. *Upon this issue* the complainants' whole case depends. If they cannot recover upon a basis of renting and hiring, there is no charge or prayer in their bill to warrant a recovery upon any other basis, and their case must fail. If the facts in the bill are not sufficient to entitle the complainants to the relief prayed, they cannot resort to the answer of the defendants, or to the proof in the case, to supply the defects in the averments of the bill. Every bill must allege facts sufficient to entitle the complainants to the *relief prayed*, or to relief under the *general prayer*. If, under *any form* of the general prayer, recovery could be had for the profits arising from the cultivation *management* adopted by the trustee, it could not under the form of that prayer used in this bill, which is not in the *disjunctive*, and the *two species* of relief, *viz*, that for renting and hiring, prayed for in the *special prayer*, and that for the profits of a cultivating management being totally dissimilar. In support of these views and to sustain our exceptions to the sufficiency of the averments of the bill, in this respect, and as to the recovery for the timber cut, we refer to the following authori-

ties, *Mitford's Pl.*, 46 to 48 and *notes*. *Story's Eq. Pl.*, secs. 241, 245, 251, 257, 264. 4 *Johns. Ch. Rep.*, 281, *Smith vs. Smith.* 1 *Daniell's Ch. Pr.*, 245. 2 *Sand. Rep.*, 252, *note* 7. 4 *H. & J.*, 518, *Hayward vs. Carroll.* 3 *H. & J.*, 221, *West vs. Hall.* 6 *H. & J.*, 29, *Chalmers vs. Chambers.* *Ibid.*, 293, *Drury vs. Conner.* 1 *Bland*, 236, *Lingan vs. Henderson.* *Ibid.*, 486, *Estep vs. Watkins.* 2 *Bland*, 45, *Townshend vs. Duncan.* *Ibid.*, 99, *Binney's Case.* 3 *Bland*, 125, *Salmon vs. Clagett.* 1 *H. & G.*, 11, *Ringgold vs. Ringgold.* *Ibid.*, 293, *Buchanan vs. Deshon.*

3rd. But if the defendants are liable to account under this bill, for the profits of the cultivation management adopted by the trustee, we then insist that there has been an accounting, and that the account of the trust in the book filed with the auditor, of which J.U.D. is a copy, is admissible and competent evidence in the cause.

A trustee is, *in no case*, to be charged with *imaginary values;* and where no *default* is imputed to him, he will only be charged with *what he actually receives.* In case of *default* a trustee will be charged with what he might have made but for his *default.* 7 *Bac., Abr.*, 181, *Title, Uses and Trusts, J.* 2 *Madd. Ch. Pr.*, 157. *Willis on Trustees*, 146, in 10 *Law Lib.* 3 *Bland*, 551, *Neale vs. Hagthorp.* 16 *How.*, 535, *Barney vs. Saunders.* 8 *Gill*, 403, *Gray vs. Lynch & McDonald.* 2 *Fonb. Eq.*, 177, *ch.* 7, *sec.* 4. 5 *How.*, 275, *Taylor vs. Benham.* 1 *Vernon*, 144, *Palmer vs. Jones.* 6 *Johns. Ch. Rep.*, 52, *Murray vs. De Rottenham.* 1 *Vernon*, 44, *Man vs. Ballet.* *Sellon's Cases in Ch.*, 53, *Hammond vs. Webster.*

It is clear that the trustee never actually received the sums claimed from his executors in the complainants' accounts, and they have offered no proof of what he did receive, or ought to have received, under the management by cultivation, nor is there any charge in the bill of any neglect on the part of the trustee in reference to such management. They have no witness who testifies that the income actually received by the trustee from cultivation equalled the imaginary value from renting and hiring. On the contrary, their main witness

states that, in estimating the value of the lands at $700 each, per year, he referred to the annual value under a system of *annual renting* for a single year, but he doubts whether under leases for five years, the same degree of productiveness, and the same keeping up of repairs being maintained, a tenant could have been found at that amount, and he does not *believe* that under the sytem *actually pursued, those amounts* were realized from the lands. This witness was an overseer of one of the farms for six years, under the trustee, and he states that, after taking what was necessary to support the negroes, who were an incumbrance upon the estate, the expenses of managing the property, including payment of overseer and the taxes upon it during these six years, he thinks the *annual surplus* of the products of the estate *were very small.*

The complainants are then utterly without proof of the income of the trust estate, upon the only basis upon which the trustee was liable to account, unless they accept the trustee's account, J.U.D. The court below could not have decreed upon the complainants' account, for they had no testimony to sustain them, and had no right to charge us in that way. The court then rejected their accounts and proceeded to pass a decree upon the basis of J.U.D., giving them more than, upon their own proof, they had a right to claim. How can they complain of this? What *right* have they to complain of it? It was a book of the trust and the court was bound to admit it as such. There is no exception to it as not being in the *handwriting* of the trustee, nor that it was not kept as the account of the trust. The answer avers that it was in the *handwriting* of the trustee, and that it was accessible to, and often seen and acquiesced in, by the *cestui que trusts.* But there is *proof* that it was in the handwriting of the trustee. The book was before the judge who tried the cause in the court below. In that trial the judge was sitting as a *jury*, and he had the right to look at the book and see in whose *handwriting* it was—to try it *by inspection*—and, after so looking at and trying it, he has pronounced it to be in the *handwriting of the trustee.* This is *proof* before *this*

*court* of the handwriting.   *Gresley's Eq. Ev.*, 343.   3 *Star-kie on Ev.*, secs. 250, 328, *page* 323.   It bears internal evidence that it was an account of the trust, its contents gave intrinsic evidence of its authenticity.   But, besides this, by agreement No. 2, a large portion of the items in this account are *admitted to be correct*.   To this solemn admission, *in judicio*, greater regard is to be paid than to admissions by the parties *en pais*, and from admissions of this conclusive kind, the court will infer any other facts naturally deducible from them.   3 *Greenlf. on Ev.*, sec. 373.   *Hoffman's Master in Chancery*, 39.   By this agreement, the complainants have said this was a *correct account*, and besides this, they have engrafted into their accounts, which they now ask this court to ratify, parts of this very account J.U.D.   They have admitted the items in regard to taxes, repairs, medical bills and the personal expenses of the *cestui que trusts*.   Why should these be admitted and the others excluded?   The sums admitted to be proper credits to the trustee amount to over $19,000, and the admissions that they are proper credits authorises the inference that the trustee paid them, and paid them out of the trust—that he had received them as income and paid them out as disbursements of that income.   But it is objected that, in this account the charges and credits are blended, and that no separate account was kept against each of the *cestui que trusts*.   But the condition of the estate was such that separate accounts could *not be so kept*.   The trustee could not give the rents and profits of *White Haven* to George, because it did not belong to him and might never be his.   Whether it would ever be his or not depended upon a *contingency*, and hence the reason and necessity for the *blended* account.   In conclusion, upon this point, and in addition to the reasons already urged, we insist that this account, J.U.D., thus in the handwriting of the trustee, and bearing intrinsic evidence of its authenticity, is admissible and competent evidence in this cause, by reason of the *death of the trustee*, of the length of time which has elapsed since it was commenced and kept, and for this position we refer to 2 *Fowler's Exchequer Practice*, 239; *Hoffman's Master in*

*Chancery*, 81, 82; 3 *Greenlf. on Ev.*, sec. 340; *Alex. Ch. Pr.*, 125; *Tamlyn's Law of Evidence* in 51 *Law Lib.*, 96; 1 *Jac. & Walk.*, 65, *Chalmer vs. Bradley;* 1 *Rep. in Chancery*, 146, *Peyton vs. Green;* 1 *Dow's Parliamentary Cases*, 30, *Lewis vs. Morgan;* 1 *Munford*, 150, *Jones' Exc'r vs. Jones;* 8 *Geo. Rep.*, 201, *Settle vs. Allison, et al.;* 3 *Gill*, 166, *Allender, et al., vs. Vestry of Trinity Church;* 2 *Brockenbrough's Rep.*, 159, *Lidderdale vs. Robinson*.

4th. As to the charge of interest. The trustee is not chargeable with interest on the income of the trust estate until the close of the trust, because it is expressly *appropriated* to certain trust purposes by the terms of the trust, and it was the duty of the trustee to hold it ever ready for these purposes. 6 *H. & J.*, 475, *Darne vs. Catlett.* 10 *G. & J.*, 175, *Comegys vs. The State.* 7 *B. Monroe*, 171, *Clemens vs. Caldwell.* 1 *H. & G.*, 11, *Ringgold vs. Ringgold.* 3 *G. & J.*, 311, *Diffenderffer vs. Winder.* 1 *Madd. Ch. Rep.*, 162, *Tebbs vs. Carpenter.* 1 *Brown's Ch. Rep.*, 384, *Treves vs. Townshend.* 18 *Geo. Rep.*, 8, *Hamilton vs. Reese.* Compound interest has never been allowed in any case of malfeasance, except where it verges upon fraud and corruption. In England there is no compounding of interest except for corruption or fraud. 31 *Eng. Law & Eq. Rep.*, 471, *Attorney General vs. Alford.* The charge in the bill that the trustee applied the annual surplus to his own use is not sustained by a particle of proof. There must be proof of such user to sustain a charge for compound interest. There can be no presumption of such use, for the law presumes that trustees discharge their duty faithfully until the contrary appears by proof. 7 *G. & J.*, 157, *Maccubbin vs. Cromwell.* 7 *Watts*, 412, *McGinn vs. Shaeffer.* 4 *Johns. Ch. Rep.*, 281, *Smith vs. Smith*, and same case, *Ibid.*, 445. Neither, under the circumstances of this case, ought the trustee to be charged with any interest on the occasional balances in his hands, until the close of the trust. The circumstances as little warrant the charge of simple as of compound interest, on such balances, for the proof clearly shows that the trustee was advancing money for the trust *daily* and receiving profits

13     v. 15

*annually.* 10 *Md. Rep.*, 352, *Mickle vs. Cross.* 5 *How.*, 275, *Taylor vs. Benham,* and cases there cited.

*Note.*—The arguments upon other points of minor import-ance in the case are omitted.

Eccleston, J., delivered the opinion of this court.

From the final decree in this case, the complainants and also the defendants have appealed.

The bill was filed on the 4th of April 1853, by George R. Dennis and Elizabeth U. Dennis, as complainants, against the defendants, George R. Dennis and James U. Dennis, as executors of John U. Dennis, stating:

That about the month of April 1833, Littleton U. Dennis, the father of the complainants, died, leaving a last will and testament, dated the 26th of March, in the same year, a copy of which was filed with the bill and marked as exhibit A.

The bill also states that in the first clause of the will, the testator devised to the complainant, Elizabeth, certain real estate, therein described, for life, without impeachment of waste, and after her death then over on certain limitations.

That by the second clause of the will, the testator devised to the complainant, George, certain real estate therein de-scribed, for life, without impeachment of waste, and after his death then over on certain limitations.

That by the third clause in the will, the lands at White Haven, formerly George Robertson's, were devised to the complainant, George.

That by the explanatory clause of the will the testator de-vised to Elizabeth the farm called "Coulbourn's Creek," on condition, that she, in a reasonable time after arriving at twenty-one years of age, should convey the lands at White Haven to George.

That on the 20th of March 1851, Elizabeth did, by deed duly executed, convey to the said George, all her interest and estate in the said lands at White Haven; and that exhibit B is a copy of said deed.

That by the fourth clause of his will, the testator devised.

DECEMBER TERM, 1859. 99

Dennis & Rush vs. Dennis & Dennis, exc'rs of Dennis.

all the residue of his real estate to the complainants, in fee-simple, as tenants in common; and that the said residue consisted of the farm or land known as the "Newbold Farm," and the Mills at or near Puncheon Landing, with the lands thereunto belonging.

The bill also states, that after giving certain pecuniary and specific legacies, the testator, by the fifteenth clause of his will, gave and bequeathed the entire balance of his personal estate to his brother, John Upsher Dennis, upon trust, during the minority of his children, or in case either of them should die under the age of twenty-one years, until the survivor of them should attain that age, to appropriate the profits thereof for the use and benefit of his children, or surviving child, and also gave to his said brother, during the same period, the entire profits of his real estate, in trust, for the same uses and purposes, and empowered his said brother to exercise any control or act of ownership over his said real estate, except selling any part thereof, or the timber thereon standing; that he also gave his said brother, during the continuance of the said trust estate, six per centum per annum upon the annual amount of the income of his said children, or the survivor of them; and also gave to his brother the care of the persons and education of his said children, or the survivor of them, with power to sell any part of their personal estates.

That, by the sixteenth clause of his will, the testator provided, that during the continuance of the trust estates, the profits of his real estate should be apportioned to the use of that one of his children who is entitled to the estate itself under his will.

That, by the will, John U. Dennis and Littleton P. Dennis, were appointed executors thereof, but that Littleton refused to act as executor.

That the complainants are the only children of the testator, that Elizabeth arrived at the full age of twenty-one years, about the month of January 1849, and George arrived at said age about March 1852.

That John U. Dennis accepted the appointments of executor and trustee, and on the 7th of May 1833, gave bond as

executor, of which C. is a copy, and that immediately thereafter the said John U. Dennis, under and by virtue of the said will, took possession of the real and personal estate of the said Littleton U. Dennis, and continued in the possession thereof until his death, which occurred sometime about the latter part of December 1851; and during all that time received the rents, issues and profits of so much of the said real and personal estates of the said Littleton U. Dennis, as was given and devised, as aforesaid, to the complainants, separately and in common.

That the complainants do not know and cannot state the precise amount received by the trustee from the rents, issues and profits of the said real estate; but they allege the said real estates were of great value, and they charge, that over and above all proper allowances for repairs, taxes and other necessary expenses, the said real estate was worth $6000 per annum during all that time, that is to say, the real estate devised to Elizabeth by the first clause of the will, was of the annual value of $1500, the real estate devised to George, by the second clause of said will, was of the annual value of $1500; the Newbold farm and mills were of the annual value of $1000; the farm called Coulbourn's Creek was of the annual value of $1000; and the lands at White Haven were of the annual value of $1000.

The bill further states, that John U. Dennis, as executor, returned an inventory of the personal estate of said testator, a copy of which is marked exhibit D; that he made sale of part thereof, as appears by a list of sales returned to the orphans court, a copy whereof is marked exhibit E; that he returned two lists of sperate debts, one on the 21st of January 1836, for $833.40, and the other on the 10th of March 1842, for $2206.37; and also stated two accounts of his administration in the orphans court, copies of which lists and accounts are marked exhibits F, G, H, and J.

That on the 10th of March 1842, the said John, as executor, made a distribution of the personal estate of the deceased, in his hands as executor, according to the will; in and by which there was awarded to him, the said John, upon

trust for the use of the complainants, during their minority, the sum of $20,189.74½, and exhibit K is a copy of said distribution.

That of said sum of $20,189.74½, the sum of $13,671.71, consisted of seventy-four negro slaves, at the value thereof as fixed by the appraisement, and the balance thereof consisted of money or articles, included in the inventory, not sold by the executor, which unsold articles, were of a perishable quality, or of such quality as that they could not be used unless consumed thereby.

The bill states, the complainants are advised, that upon the acceptance of the said trust, it became the duty of the said John, to rent, to good and prudent tenants, the real estate, for the best rent that could be fairly obtained, and to have hired out, for the best prices, said slaves, to good and careful masters, and to have converted the residue of the said property, on account of its perishable nature, into money, and have invested the same in some safe and productive fund, for the benefit of the complainants; and the income derived from said rents, and hires and interest, after paying out of the same the expenses of said trust, the necessary repairs and the expenses for the maintenance and education of the complainants, if any should remain, to have invested at the close of each year for their benefit; but now so it is that from the death of the testator to the time of his own death, the said John had in his possession all the said real estate, so as aforesaid devised to the complainants, and also all the personal estate, so as aforesaid distributed to their use; that by his agents and servants, he occupied, cultivated and worked the real estate, and employed the said slaves, and used, or wasted and destroyed, all the rest and residue of said property, and received and took to his own use the issues and profits thereof.

The complainants aver their inability to state what the trustee received for the labor and services of the slaves, but they charge that the slaves were worth, from the death of the testator to the decease of the trustee, an annual hire of $4000, above all proper charges for support and clothing of said

slaves and for taxes; and that the residue of the property distributed as aforesaid, was worth a sum per annum equal to the legal interest on the appraised value thereof.

The complainants state that they were very young at their father's death, and have very little personal knowledge of the manner in which their uncle conducted and managed the trust estates, or of the care he took of them, or in what condition he found the same when he took possession of them, but they have been informed and believe, they were in fine order and condition and productive; and they charge, that during the continuance of the trust, the lands were greatly impaired in value; and when the same came to their hands, since the death of the trustee, they found their land in bad condition and unproductive, the buildings dilapidated and decayed, and the whole estate greatly wasted and injured; and the complainants charge that the said John did not use proper care and diligence in preserving the same; and they insist that they are entitled and ought to receive compensation for all waste and decay, arising from such want of care and diligence; and they aver and charge that the real estate was so injured to the value of $10,000.

The complainants say they are informed and believe, that the said slaves have greatly increased in numbers during the continuance of the trust; but for want of correct information, they are unable to state the names, numbers, ages and value of said increase, and they are advised that said increase are part of the trust estate, and that the trustee is responsible for the same, and they pray that when the names, number and value of said increase shall have been discovered, that the trustee shall be held accountable for the annual value of the same; and where such additional slaves have not been received by the complainants, that the trustee may be charged with the value thereof.

The bill charges that the trustee sold part of the slaves, to wit: one negro man, three negro women, and three negro children, but the complainants are unable to state when they were sold, their names, or what sum they sold for, but they insist that the said slaves were worth $5000, and claim their value, with interest from their sale.

Dennis & Rush *vs.* Dennis & Dennis, ex'ers of Dennis.

The bill states that, from the death of the testator, the said John, under the will, took care of the complainants, and maintained and educated them, that Elizabeth lived in his family, or was at school, until her marriage, and George lived also in his family, or was at school, under his direction and control; but the said John never qualified as guardian, except in so far as the acceptance of the said trust, and the possession of the persons and property of the complainants under the said will, may be considered such qualification.

That the complainants do not know the sums expended for their maintenance and education, but they are willing to allow and credit, in any account that may be taken, all reasonable and proper expenditures for those purposes.

That there was, or ought to have been, and, if the trustee had performed his duty, there should have been, at the close of each year, a large surplus, which it was the duty of the trustee to have invested for the benefit of the complainants, but they are informed and charge, that the trustee never invested said annual surplus for their use and benefit, but applied the same to his use. And they insist that he ought to be charged with interest from the close of each year on such surplus, in such manner as will preserve the complainants from loss by his failure to invest the said annual surplus as it accrued.

That, in 1846, the said Elizabeth intermarried with Littleton Dennis, who died in 1847, but John, the trustee, did not account with her husband concerning the trust, or in any manner settle the same during her husband's life, nor did her husband, the said Littleton, reduce into possession any of the property of his wife; but, by his will, released and quit claim to any of her property, on condition that she would release and abandon all claim to his estate, which she has done.

That much of the personal property distributed to the trustee as aforesaid, has been wasted, lost and destroyed, or greatly injured or impaired, from the management and want of care in the trustee, and although, for want of information, the complainants cannot state the amount wasted, lost,

destroyed or injured, they still insist that the amount, when discovered, shall be charged against the said trustee.

That, after the death of the said John, in 1851, the complainants took possession of the real estate devised to them, and also of the slaves and other personal property, found on the said real estate at that time; that they do not know the value of the personal property, exclusive of the negroes, so taken possession of by them, but they insist it was greatly less in value than the personal property, exclusive of negroes, bequeathed to them by their father, as aforesaid, and if, in any account which may be taken by the court, concerning the said trust, the trustee shall be charged with the value of said personal property, exclusive of negroes, in money, as the complainants insist should be done, they are willing to be charged, and that said John should be credited with the value of the personal property, exclusive of negroes, so found on said real estate, and taken possession of by the complainants.

The bill further states that John U. Dennis, the said trustee, by his will, appointed the defendants, James U. Dennis and George R. Dennis, his executors, who accepted the trust; and, as such executors, have in their hands sufficient assets to pay the claims of the complainants against the said John, and all other debts which he owed at the time of his death.

That the said John, in his lifetime, never accounted as executor, with the orphans court, or with the complainants, or either of them, of and concerning the said property, real and personal, and the annual interest and profits thereof, so as aforesaid left to them, by their father, or paid the same, and the increase, and income, and profits thereof, to them; nor have the executors of the said John ever accounted with and paid the same over to the complainants.

That the complainants have, from time to time, requested the executors of the trustee to account and pay whatever may be found due, but they have always neglected and refused, and have always met these demands with frivolous excuses and pretexts, sometimes pretending that the trustee, in his lifetime, accounted and delivered over all the trust

Dennis & Rush *vs.* Dennis & Dennis, exc'rs of Dennis.

property and income, and at other times, that there never was any such trust created, sometimes that they have settled with the complainants, and at other times, that they have no assets of the said John out of which the complainants can be paid; all which pretences are charged to be unjust and untrue.

The prayer of the bill is, that the executors of the said John may answer the premises; and that an account may be taken, under the direction of the court, of the property devised and given to and for the use of the complainants, and each of them, by the will of their father, which came to the hands and possession of the said John, trustee as aforesaid, and of the annual value, from the death of their father, of the real estate devised to them, severally and in common; and also of the value, annually, of said negro slaves and their increase, and of the value of the slaves sold, with interest thereon; and of the value of the other property given to the said John in trust for the complainants, and with interest on said value from the date of his letters testamentary on their father's personal estate; also, that an account of the waste and injury to the real estate of the complainants, while in the hands of their said trustee, and of the interest properly chargeable against the said John; and that, by a decree of the court, the said executors of the trustee may be compelled to pay to the complainants what, on such an account, may be found justly due them respectively; and that the complainants may have such other and further relief in the premises as may be just and proper, according to the nature of their case.

The following extracts from the will of Littleton U. Dennis, will disclose the nature of the trust which gave rise to this controversy:

13*th Item.* "My will and desire is, that great care be taken in the education of my children, and that no expense may be avoided which may be necessary for that purpose. I do not mean that my son shall have money enough to buy a diploma from the faculty of a college, or that my daughter shall have money enough to spend several years in a board-

ing school of high character; but that their minds (if capable of it) shall be highly cultivated, that no facilities within the reach of their income shall be withheld, for I would have them both learned.''

15*th Item.* "After my executors, hereinafter named, shall have paid my debts and settled my personal estate, I give and bequeath the entire balance of my said personal estate, except what may be bequeathed by this will to my brother John Upsher Dennis, upon trust, during the minority of my children, or in case either of them die under the age of twenty-one years, until the survivor of them shall attain that age, to appropriate the profits thereof, for the use and benefit of my said children or my surviving child. I also give and bequeath to my said brother, during the same period, the entire profits of my real estate, upon trust, for the same uses and purposes. I also authorize and empower my said brother to exercise any control or act of ownership over my said real estate, of which I myself am capable, except the selling of the whole or any part of it, or the selling of timber off it; for my will and desire is, and these words of desire are imperative, that no timber shall be sold during the infancy of my children, or either of them, from any part of my real estate, and that no timber be felled thereon, except for the necessary consumption of my respective farms, during the continuance of the said trust estates. I give and bequeath to my said brother, six per centum per annum upon the annual amount of the income of my said children, or the survivor of them, during the continuance of the said trust estate. I give to my said brother the care of the persons and education of my said children, or the survivor of them, with power to sell any part of their personal estates.''

Part of the 16*th Item.* "Be it also known, that during the continuance of the trust estates created by the preceding clause of this will, my will and desire is, that the profits of my real estate shall be appropriated to the use of that one of my children who is entitled to the estate itself under this will.''

The bill is not sworn to, nor does it call for an answer under oath.

At October term 1853, the defendants filed their answer without oath.

In their answer they admit the death of Littleton U. Dennis, leaving his will as stated in the bill, and that exhibit A is a true copy; to which they refer for a correct statement of the several devises and bequests made by the said Littleton, submitting the true legal construction to the court. They admit the execution of the deed from Elizabeth to George, and that exhibit B is a correct copy thereof; that the residue or balance of the real estate mentioned in the will is properly described in the bill; also the renunciation of Littleton P. Dennis, as executor; that the complainants are the only children of the testator, and that they arrived at full age, at the times stated in the bill. They admit the acceptance of the trust of executor and trustee, by John U. Dennis, and that in virtue thereof he took possession of the real and personal estate of Littleton U. Dennis; but they deny that the said John continued in possession thereof till his death in December 1851, on the contrary, they aver, that he gave up the possession thereof to the complainants, on the first of January 1850. They admit that the property devised by said Littleton was of large value; but they deny that the several parcels of real estate, set forth in the bill, were of an annual value at all approximating the value stated in the bill. They admit the inventory, list of sales, lists of debts, administration accounts and distribution, mentioned in the bill, of which exhibits D, E, F, G, H, J and K are copies; but they aver that in the list of sperate debts, dated the 10th of March 1842, (exhibit G,) said John made an error in charging himself with the sum of $629.64, debt of William Perkins, whereas the amount should have been $504.22, and they claim to have the error corrected in the settlement of the trust account. They deny that the slaves which were in the hands of the said John were of the appraised value stated in the bill, and that any portion of the property mentioned in the distribution, as left in trust for the complainants, was in the hands of said John, in money, on the contrary, they aver, that the amount of money received by him, and belonging to said

estate, was altogether insufficient to pay the debts, and expenses of administration, and legacies, but that to pay [the same the said John advanced, of his own means, the sum of $3051.86½, to which extent, with interest from the time of his payment thereof, said Littleton's estate was, and the complainants, now are, indebted to the defendants, as executors of said John.

The defendants aver, that the personal property mentioned in the inventory, and not sold by the executor, consisted, besides negroes, of horses, cattle, and other live stock, farming utensils, and provisions required for the maintenance of the negroes of the estate, and were reserved, by the trustee, for the use of the complainants, in the cultivation of their estates; that the said property, and its increase, and the results of its use, continued on the said real estate, and in said employment and use, from the death of said Littleton U., till the complainants took possession of it, with their real estate, and appropriated it to their own use.

They deny that the will imposed on the trustee an obligation to manage the property in any particular manner, but left him free to manage the same in such manner as he, in the exercise of a reasonable discretion and diligence, might consider best for the interests of the beneficiaries of the trust.

They aver that, in the exercise of proper discretion and diligence, the trustee cultivated the trust real estate by means of the slaves and other personal estate belonging to the trust, and kept an annual account of the issues and profits thereof.

That the trustee managed the trust estate with skill, fidelity and attention; that he gave to the oversight thereof a very large portion of his time, and instead of wasting the estate, or causing, or suffering its deterioration, he left it in as good condition as any of his own real estate, except the mansion house farm, on which he resided; and they deny that complainants have any claim for compensation for deterioration of the estate, whilst in the trustee's hands.

They admit that the negroes have very considerably increased in numbers and value, during the trust, but aver that the complainants have received the full benefit of such increase.

They deny that the trustee's possession of the trust estate continued till his death, as charged in the bill, but aver, that in 1849 the complainants caused an inventory or list of the slaves and other personal property of the trust, in the hands of the trustee, to be made by two disinterested persons named by the complainants, and at the request of the complainants the trustee delivered to them the entire trust estate, and from that time the complainants have been in the possession of their said property, and have used the same, and received the profits and income thereof.

That the personal property so delivered to the complainants by the trustee, far exceeded in value that which came originally into the hands of the executor or trustee.

The defendants say they have no knowledge of any sale, by the trustee, of trust negroes, but if any were sold they expect to be charged with the value thereof.

They deny that the slaves were worth an annual value of $4000, as charged in the bill, above all proper charges for support and clothing of said slaves and taxes; and also deny that the property distributed to the trustee, for the use of the complainants, was worth the interest on the appraised value thereof.

They admit that said John gave no bond as guardian, and passed no guardian accounts; they admit the marriage of Elizabeth, and the death of her husband, but charge that, during his life, he took the possession and management of his wife's property.

The defendants admit the death of the said John, the execution of his will, their own appointment as executors, and their acceptance of the trust, their possession of his personal estate, and its sufficiency to meet all just and proper claims against it.

They aver that they have always been ready to account with the complainants concerning all just and proper claims which they may have against the estate of the said John, the complainants, however, having never, before bringing suit, presented any specific claim; and the defendants deny any such pretexts and excuses as are alleged in the said bill to have been made by them.

To this answer the general replication was put in.

At April term 1854, the marriage of James M. Rush with the complainant, Elizabeth, was suggested, and he made a party complainant.

At July term 1854, the defendants asked leave to amend their answer, which was granted by the court.

During the same term, the following agreement between the parties, was filed:

"In this cause, it was agreed that this cause be referred to William J. Byrd, with power to take such testimony, as a commissioner, on the usual notice, as may be offered by either party, reduce the same to writing and return the same to this court; and that he, from the pleadings in the cause, and the proofs now in the cause, and which hereafter may be taken by him, state such account or accounts of the trust as may be required by either party, and return said accounts, and all his proceedings to this court, for such action as shall be proper in the premises; and it is further agreed that all questions arising under the pleadings and evidence, shall be reserved until the coming in of the auditor's statement."

The record states that, "In pursuance of which said agreement, by order of the circuit court here, the premises aforesaid are referred to the said William J. Byrd, Esq., for the purpose contained in and according to the said agreement."

At January term 1855, the defendants filed a "supplemental answer," without oath, in which they state that, during the life of their testator, John, the trustee, the account of the trust under the will of Littleton U. Dennis, kept by the said trustee, as stated in the original answer, was accessible to, and often seen by the complainants, George and Elizabeth, and that each of them had expressed themselves satisfied with the correctness of the same.

That since the death of the trustee, the defendants, as his executors, have been ready and willing, at all reasonable times, to exhibit to the complainants, or to any of them, the original account of the trust, in the handwriting of the trustee, and have repeatedly offered to settle with the complainants, upon the basis of said account, the amount due to them,

respectively, with interest, correcting all errors in said account.

That in March or April, 1854, the defendants, upon request, furnished to the complainants, through their solicitor, a copy of said account; and, as part of the supplemental answer, a copy of said account is filed, marked exhibit J.U.D.

And the defendants tender the use of the said original account to the complainants, and to the proper officer of the court, in any account of the trust to be taken under the order of the court.

Then follows the copy of the account marked as exhibit J.U.D.

To the supplemental answer there is a general replication.

In 1857 the death of Elizabeth U. Rush was suggested, and James M. Rush, as her executor, made a party complainant.

On the 27th of April 1857, the auditor, William J. Byrd, made a report, with which he returned the documentary or written evidence, offered and filed with him by the parties; and also the parol testimony of the numerous witnesses examined before him.

In his report he says, "that, according to the terms of the agreement referring this cause to him, after having taken and reduced to writing all such evidence as was offered by either party, he proceeded to state for the parties sundry accounts, according to their respective requirements. For the complainants, and according to the instructions of their solicitors, he has prepared the statements and accounts herewith returned, designated Statement A—Statement B—and Statement C—Account E.U.D., No. 1—Account E.U.D., No. 2—Account G.R.D., No. 1—and Account G.R.D., No. 2.

"For the defendants, and according to the instructions of their solicitors, he has stated and herewith returns the accounts marked Account L.U.D.—Account E.U.D., No. 3—Account E.U.D., No. 4—Account G.R.D., No. 3—Account G.R.D., No. 4.

The accounts G.R.D., No. 5, and G.R.D., No. 6, reported as made for the defendants, we are informed, have been abandoned.

Dennis & Rush *vs.* Dennis & Dennis, exc'rs of Dennis.

The auditor says, in his report, "These accounts have all been stated in accordance with the instructions of the respective parties, not only in the general principles upon which they are stated, but also in the details of the accounts.

"The auditor, by the terms of reference, was not required to state any account upon his own responsibility, or according to his own views and discretion, but only to follow the instructions of the parties. He has not transcended the limits of the duty thus assigned him—but in every instance, where any doubt might exist as to his course, he has been governed by the instructions, written or verbal, of the party at whose instance the particular account was stated."

After an explanation of the several statements and accounts, the auditor concludes by saying:

"As to the further *details* of these several accounts, they sufficiently *explain* themselves—and the auditor, as he has before stated, having followed the instructions of the respective parties, in reference to the theory of the accounts, and the principles on which they are based, leaves the maintenance of their consistency and propriety to those at whose instance they have been stated."

When speaking of the documentary evidence offered, the auditor, in his report, says:

"The defendants also filed with the auditor, (as per their statement filed,) the following as evidence, to wit:

"The book of the testator, containing the account of the trust referred to in their answer to the bill, and tendered, and a copy filed with their supplemental answer."

This is the much controverted account, J.U.D. It appears in the record, and is preceded by the following language:

"And at the same time, the said auditor, to wit, William J. Byrd, Esquire, exhibits and files in the said circuit court here, in the said cause, a book purporting to be in the handwriting of the said John U. Dennis, deceased, containing an account of the said trust; which said account, in the said book, ensues as follows, to wit:"

The account is then stated; beginning in January 1834,

and ending November 1851, in regard to charges against the "estate of L. U. Dennis, deceased," and beginning with the credits, in January 1834, and ending in June 1850.

At the foot of the account appears the following:

"1850, January 1.—E. U. D. and G. R. Dennis having commenced keeping house this year, I have given the management of their property to them, and they have promised not to hold me responsible for their property any longer. January 1st, 1850."

There is an agreement signed by the solicitors of the parties, in relation to the copy of this account, filed by the defendants with their supplemental answer; which agreement is as follows:

"In this cause it is agreed that in any accounts which may be taken in this cause, the defendants shall be credited with all charges for taxes paid, for repairs to buildings, for medical bills, and for board, clothing, tuition and other personal expenses of the *cestui que trusts*, George and Elizabeth, contained in the account marked 'exhibit J.U.D.,' filed January 4th, 1855, by the defendants, with their supplemental answer, as of the times therein charged, and against the particular *cestui que trust*, or both, as from the nature of the charge may be proper. And it is further agreed that the other items charged in said account, (except the item of $200 to Mrs. S. D. Bayley, and the item of $800 to Mary U. Dennis, which are hereby absolutely rejected,) shall be considered and treated as the bills and receipts of the persons to whom said payments profess to have been made, would be, if the same were produced and offered in evidence, and the execution of said receipts proved, and liable to all such exceptions as such bills and receipts would be liable to, if the same were offered in evidence; provided, that in making this agreement, the complainants shall be understood as waiving any claim set up by the bill, or as admitting the propriety of the trustee's management of the trust, or that said items, or any of them, except those hereby unqualifiedly admitted, are proper charges against the trust estate, and legal

15    v. 15

and competent evidence in this cause, or that said account is a proper, or any account, of the trust created by the will set forth in the bill."

After having mentioned the book containing the "Account J.U.D.," the auditor says, the defendants filed with him, as evidence, "also, another book of their testator, containing a separate account against Elizabeth U. Dennis, in the hand-writing of their testator. Also, a copy of said last mentioned account, marked E.U.D."

In addition to the above, he reports, the bill obligatory of Wm. Perkins, with the endorsements thereon, and receipt of balance by John U. Dennis.

The report, also, includes sundry receipts for taxes, and other receipts for various sums paid to or for the *cestui que trusts*, which are not disputed.

Among the papers filed with him, by the defendants, the auditor says, is "also an account of the articles bought by Mrs. E. U. Dennis, at the sale of the personal estate of Littleton Dennis."

The auditor, also, reports the following agreement, signed by the solicitors of the parties:

"In this cause, it is hereby agreed that the paper writing herewith filed with the auditor, endorsed, 'Division of the personal property of Mrs. Elizabeth Dennis and George R. Dennis, Esquire,' contains a full list of the negro slaves, and personal property, being and remaining on the real estate of the said Elizabeth and George, mentioned in the proceedings in this cause, received by the said Elizabeth and George from John U. Dennis, the trustee, in the year 1850, with a description and valuation of the same, except those negroes opposite whose names the valuation is left blank, and it is agreed that said paper may be read by either party at the trial of this cause.

"And it is further admitted that the negroes named in the said paper, are, as far as they go, the same named in the inventory of the personal estate of Littleton U. Dennis, mentioned in the bill, in this cause, and the residue are the natural increase of those who are named in said inventory:

and that the negroes, described in the said inventory and not in said paper, have not been delivered by said trustee, or his executors, to these complainants, or either of them; but it is expressly agreed that this last admission shall not affect any question in reference to the negroes mentioned in the testimony of James H. White, before the auditor, as having been taken from the Essex farm by Mr. Overly, which might be raised but for said last mentioned admission.''

The paper, alluded to in this agreement, shows, that there are negroes included in the division, who were divided by the parties without regard to valuation.

It also shows, that Elizabeth's part of the negroes valued, amounted to - - - - - - - $17,800.00

And her portion of other property amounted to    1,505.00

$19,305.00

George's part of the negroes, as valued, amounted to the same sum as Elizabeth's.   And his portion of other property also amounted to the same as hers.

Having reported the statements, accounts, and other matters already mentioned, the auditor says, "that since the making of his report in this cause, he has, at the request of the complainants, and by their directions, prepared, and herewith returns, an additional statement, designated 'Statement D,' exhibiting the personal property of Littleton U. Dennis, deceased, included in the inventory by the executor according to his account of sales, and the residue specifically remaining unsold in the hands of the executor.   From this Statement it appears, that there remained in the hands of the executor after the sales reported by him, exclusive of legacies, personal property specifically, amounting to $9,020.94.''

The statement shows this balance of $9,040.94 is exclusive of legacies, and of negroes also.   It likewise shows this balance includes, as property appraised in the inventory and not included in the list of sales, 477½ lbs. of wool, 1340 bushels of corn, and 75 bushels of oats, appraised at $894.34, and also the crops at White Haven, Annamessex and Essex, "including the tenants," "estimated" and appraised at

$4,838.00. None of these appearing in the list of sales, returned by the executor, the auditor includes them in the balance of unsold personal property.

"Statement A" is designed to show the annual value or income of the negroes of the estate from 1834 to 1849, inclusive; being rates fixed upon by the complainants, according to their views of the weight of evidence.

"Statement B" is intended to show the balance of personal property, other than negroes, distributed to John U. Dennis, as trustee, for the use of the *cestui que trusts*, in the settlement of his account as executor.

After reporting this statement, the auditor discovered it to be erroneous, and corrected the errors, by reporting another. In the second, he makes the value of the ne-

groes distributed to be, - - - - - - - - - $13,671.00
And the other personal property distributed to be,   6,399.59

$20,070.59

The difference between this sum and the amount stated in the distribution, (exhibit K.,) as it appears in the office copy, results from a correction of the error in relation to the sperate debt due from Wm. Perkins.

"Statement C" presents the claim of George R. Dennis, for the timber cut on the White Haven farm, in 1846, according to the testimony of Wm. Holliday, amounting to the sum of $888.00.

In "Account E.U.D., No. 1," as corrected by the auditor, the complainant, J. M. Rush, in right of his deceased wife, claims a balance of $48,167.21, as due the 1st of April 1857.

In "Account E.U.D., No. 2," as corrected, the balance claimed is $40,661.33.

The difference between these two accounts results from compound interest being charged in one and omitted in the other.

In "Account G.R.D., No. 1," as corrected, George R. Dennis claims a balance of $53,068.37, due 1st of April 1857.

In "Account G.R.D., No. 2," as corrected, the balance claimed to be due, 1st of April 1857, is $46,698.38.

Compound interest is charged in No. 1, and not in No. 2.

In relation to the four accounts just mentioned, the auditor says: "the allowance to the trustee for taxes paid, is according to the vouchers filed with the auditor, which differ in some cases from the amounts charged in account J.U.D., filed by the defendants."

In his report, whilst making an explanation of "Statement A," the auditor says: "All the accounts stated at the instance of the complainants, discard the management of the trust as conducted by the trustee, and claimed to be accounted for in the account 'J.U.D.,'—and seek to establish from other sources the actual value, under fair management, of the trust property during the continuance of the trust."

The explanation given to "Account E.U.D., No. 1," contains the following remarks: "It then makes him (the trustee) allowance for all the personal expenses of the *cestui que trust*, charged in account J.U.D., filed with the defendants' answer, which are clearly applicable to her—and with one half of all the expenditures for taxes, medical bills, repairs, and other expenses applicable to both *cestui que trusts*, and admissible or chargeable under the complainants' theory in stating the account; of course, all charges growing out of the cultivation of the estate, are rejected from the account."

Defendants' statement, or "Account L.U.D.," is intended to be a synopsis of the complainants' exhibits D, E, F, G, H, J and K, filed with their bill, they being the inventory, accounts of sales, lists of sperate debts, administration accounts and distribution, as they appear of record in the orphans court. This statement corrects the error in the charge of the sperate debt due from Wm. Perkins; which error appears to be conceded by the complainants.

This account, the auditor says, "In other respects agrees with the accounts passed in the orphans court. It ascertains the balance distributed to the trustee in money and in specific property, in a manner explained by a note appended to the account. The defendants assume that the sales of grain,

&c., charged in account J.U.D., for the year 1834, are sales of property included in the inventory of Littleton U. Dennis' estate. That amount is accordingly brought into the administration account, instead of being included in their statement of the trust account. Assuming that amount of the property included in the inventory, and not in the list of sales, to have been converted into money, this account shows the balance distributed to the trustee for the use of the *cestui que trusts*, in negroes, $13,671.00—in specific property other than negroes, $5959.40—and in money, $438.30. It also shows that $12.12 was distributed to the trustee as the proceeds of a legacy bequeathed to E. U. Dennis, and sold; and that $49.40 was distributed to the trustee as the proceeds of a legacy to George R. Dennis, also sold."

The following are the auditor's explanations of the defendants' accounts, of the trust, E.U.D., No. 3 and No. 4, and G.R.D., No. 3 and No. 4:

"Account E.U.D., No. 3, between the trustee and E. U. Dennis, is based upon the account J.U.D. It excludes, however, the proceeds of grain, &c., sold in 1834, according to account J.U.D., the same having been included by them in the administration account, L.U.D. It also excludes the legacies to Mrs. Mary Bayley and Mary U. Dennis, according to agreement No. 2. Excepting these items, account E.U.D., No. 3, charges the trustee with half the proceeds of grain from Essex, half the rent of mills and houses and lots on Newbold tract, and with the proceeds of grain from Annamessex farm—with half the annual interest on $438.30, balance in the trustee's hands in money, on settlement of his administration account—with annual interest on the proceeds of legacy to Elizabeth, sold and distributed to trustee—with annual interest on the value of negroes Ephraim and Rose Ann—and with any other items charged to him in account J.U.D., applicable to Elizabeth U. Dennis, for each year from 1834 and 1835, (which are included in one account,) to 1850 and 1851, (also included in same account,) inclusive. Allowance is made to the trustee in each year for all the disbursements in the account J.U.D., applicable to E. U. Dennis

—all the disbursements applicable to both *cestui que trusts*, or not specified as to which *cestui que trust* applicable, are divided, and one-half allowed to the trustee in this account, and the other half in his account with George R. Dennis. He is also allowed a commission of six per cent. on the income, according to the provisions of L. U. Dennis' will.   A statement is then made, as of the 1st of April 1857, in which the trustee is charged with half the balance remaining in trustee's hands in money, on settlement of account as executor—with half the value of negroes Ephraim and Rose Ann—with the legacy distributed of Elizabeth U. Dennis—with interest on the same from 1st January 1850, to 1st April 1857, also with the balances of accounts for the several years in which the receipts by the trustee exceeded the expenditures, with interest on said balances from the time they are ascertained to the 1st of April 1857, and is allowed credit for the balances of accounts for the several years in which the disbursements by the trustee exceeded the income, and also for the payment of $100, made by the executors of John U. Dennis to Elizabeth U. Dennis.   This statement shows balance due James M. Rush, (the representative of E. U. Dennis,) as of the 1st of April 1857, of $3522.30.   In the statement of the defendants' accounts, it has sometimes been very difficult, if not impossible, to tell whether an item of expenditure was properly applicable to both, or one only, of the *cestui que trusts*—in such cases, the auditor has generally been governed by the direction of the defendants as to the particular item, and he leaves to them the maintenance of the propriety of the course pursued.   In 1848 and 1849, crops from Essex and Annamessex are mixed in the charge in Account J.U.D.   The auditor has, by instructions, divided the proceeds equally between the two farms, giving half to E. U. Dennis, as the proceeds of Annamessex, and dividing the remaining half between E. U. Dennis and George R. Dennis, as the proceeds of Essex."

"Account E.U.D., No. 4, adopts the account E.U.D., No. 3," (to the end of the year 1851,) "and makes a statement between the trustee and *cestui que trust*, Elizabeth U.

Dennis, as of the 16th of March 1852, the period at which George R. Dennis, of L., the younger of L. U. Dennis' children, arrived at the age of twenty-one years. That statement charges the trustee, as in account E.U.D., No. 3, except that it does not charge any interest on the annual balances against him—allows him the same credit as in the preceding account; and shows balance in favor of the trustee, at that time, of $51.20.    That balance, and the payment of the executors of J. U. Dennis, with interest on them to the 1st of April 1857, show balance due to the executors of the trustee, from E. U. Dennis' representative, of $186.77, on the 1st of  April 1857."

"Account G.R.D., No. 3, is stated on the same principle as Account E.U.D., No. 3.    The trustee, in it, is charged with half of the items divided in Account E.U.D., No. 3, and with the proceeds of White Haven farm, and the interest on legacy to George R. Dennis.    He is allowed credit for half the disbursements divided in Account E.U.D., No. 3, and for all the disbursements applicable to George R. Dennis only, or to his property, from each year, from the beginning to the close of the trust—1834 and 1835 being included in one statement, and the expenditures, after the 1st of January 1850, being also included in a single statement.    A statement as of the 1st of April 1857, shows a balance due George R. Dennis, of L., by the executors of the trustee, as of that date, of $8,251.33, over and above all payments."

Account G.R.D., No. 4, adopts the Account G.R.D., No. 3, to the end of the year 1851, and therefrom a statement is made between the trustee and George R. Dennis, as of the 16th of March 1852, making the same charges and credits as in the statement of the same date of Account G.R.D., No. 3, except that interest, in Account No. 4, is not charged on the annual balances against the trustee.    The auditor says: "This statement shows balance due George R. Dennis, 16th of March 1852, of $4,009.94, computing interest on this balance, and deducting payments made by the executors of the trustees, to the 1st of April 1857, a balance is found due to

George R. Dennis by said executors, at that period, of $1,957.16."

The payments above mentioned, as made by the executors to George R. Dennis, are shown by two receipts, which are not disputed; one dated 1853, March 21st, for $2500.00, and the other February 4th, 1854, for $200.00.

The court below decided:

*First.* That the trustee, John U. Dennis, in the use and employment of the trust estate, acted discreetly, and entirely within the contemplation and limits of the trust conferred on him by the will of Littleton U. Dennis, deceased.

*Secondly.* That, in the management of the trust, the trustee exercised great care, diligence and fidelity.

"*Thirdly.* That Account J.U.D., should be received by the court as an account of the rents, issues and profits of the trust estate, and of the disbursements on account thereof, and for the use and benefit of the *cestui que trusts*, because of agreement No. 2, filed in the cause, and of the death of the trustee before the expiration of the term or period of the trust, and before he could have a settlement of the trust with the *cestui que trusts*, and the said account being in the hand-writing of the trustee, and bearing intrinsic evidence of having been kept by him, and intended as an account of the products and proceeds, and expenses of the trust estate, and *cestui que trusts;* and because of the entire absence of evidence to impeach the correctness of said account, or to show that irremediable, or any loss, or injury must or will result to the complainants, if said account is so received.

*Fourthly.* That the complainants should not be allowed compound interest.

*Fifthly.* That the trustee should not be charged with simple interest, as claimed by the complainants, upon the excess of the products of the said estate, over the expenses thereof, in the occasional years of the trust, when the products did exceed the expenses.

*Sixthly.* That the trustee should not be charged with, nor account for, the amount of the personal estate of his deceased testator, as shown by the final account passed by him

as executor, in the orphans court, and filed in the cause; because such account is shown by the evidence to be erroneous; but that he should be charged with, and account for, the maount shown to be correct by all the evidence in the cause.

*Seventhly.* That the trustee should be charged with, and account for, the values of negroes Celia Ann, Charlotte and Hester, mentioned in the proceedings, and with the interest thereon, from the 1st day of January 1850, to the date of the decree for the benefit of the two *cestui que trusts;* and also with the value of the timber cut and sold by him from the "White Haven farm," with interest thereon from the 1st of January 1847, to the date of the decree, for the benefit of the *cestui que trust,* George R. Dennis.

In regard to Elizabeth U. Dennis' portion of the trust estate, the court below adopted the account E.U.D, No. 4, up to the 16th of March 1852, correcting it by the addition of one-half of the value of the above named negroes, Celia Ann, Charlotte and Hester, valued as follows:

Celia Ann, - - - - - $675 — ½          $337.50
Charlotte, - - - - - 650 — ½          325.00
Hester, - -, - - - - 450 — ½          225.00

Adding interest on the half of such value from the 1st of January 1850 to the 16th of March 1852, and then charging the trustee with interest on the balance of the account thus corrected, from the 16th of March 1852 to the 15th of January 1858, the date of the decree, allowing him the credit of $100 as paid to Elizabeth, by the executors, on the 26th of November 1853. The account, so adjusted, shows a balance in favor of James M. Rush (as surviving husband and executor of Elizabeth) of $1188.10. A decree in his favor was passed for this sum, less a moiety of the costs incurred by the defendants in this suit.

In relation to George R. Dennis' claim, the court adopted the account G.R.D., No. 4, up to the 16th of March 1852, corrected by the addition of one-half the value of the three negroes above named, also adding $888 for the estimated value of the timber cut and sold from the "White Haven

farm," and including interest upon half the value of the said three negroes, from the 1st of January 1850 to 16th of March 1852, also upon the estimate of the said timber, from the 1st of January 1847 to the 16th of March 1852; and then charging interest on the balance of the account, thus corrected, from the 16th of March 1852 to the date of the decree, allowing credits for the payments made by the executors of the trustee to George R. Dennis, already mentioned in explaining Account G.R.D., No. 4.    The account, when thus corrected, will show a balance in favor of George R. Dennis of $5029.53; in whose favor the decree was passed for this sum, less a moiety of the costs in this case incurred by the defendants.

Having, with much care, examined the pleadings, evidence, and other proceedings in the cause, it appears to the court that the substantial merits of the case require that it should be remanded, for further proceedings, under the Act of 1832, ch. 302; and therefore the cause will be remanded without reversing or affirming the decree.    In doing which, it becomes our duty to express our views in regard to the points which have been made, and which are presented by the record.

The bill states that the complainants are advised that it was the duty of the trustee to rent out the lands, to hire out the negroes, and to convert into money all the other trust property, and invest the proceeds.    Because this was not done they claim the right to demand what the trustee might have made but for such neglect or failure to perform his duty. The defendants insist that upon this issue the complainants' whole case depends.    And, as exceptions to the averments of the bill have been filed, it is said that unless they can maintain the issue thus made, the facts set forth in the bill are not sufficient to entitle them to the relief prayed, or to any relief.    To such a position we cannot yield our assent.

There can be no doubt that the will gave the trustee very large discretionary power.    The language on the subject is, "I also authorize and empower my said brother to exercise any control or act of ownership over my real estate, of which

I, myself, am capable, except the selling of the whole or any part of it, or the selling of timber off it." The entire residuum of the personal estate, after payment of debts, legacies and expenses of administration, was given in trust, with power in the trustee to sell any part thereof. Having such discretion, instead of being obliged to rent out the lands, the trustee possessed the authority, if he deemed it proper, to have them cultivated for the benefit of the *cestui que trusts.* And it is very certain that the real estate, excepting a very small portion thereof, was cultivated under the supervision and direction of the trustee, by means of the negroes and other personal property belonging to the trust estate. But notwithstanding this method of managing the estate was authorized by the will, nevertheless, we think, the bill is sufficient to require an account of the trust, and under it the complainants may claim such portions of the trust estate, real and personal, as can be shown to have come to the hands of the trustee, and were not delivered over to the *cestui que trusts,* including increase of negroes, and issues and profits arising from real or personal property.

That the facts alleged in the bill are sufficient to support the prayer for an account and general relief, will appear from the consideration of a few well settled principles.

Matters of law, or legal presumption, need not be stated. *Story's Eq. Plead., sec.* 24.

Every material fact, to which the plaintiff means to offer evidence, ought to be stated; but a general charge or statement of the matter of fact is sufficient, and it is not necessary to charge minutely all the circumstances which may conduce to prove the general charge. These circumstances are properly matters of evidence, which need not be charged in order to let them in as proof. *Ibid., sec.* 28.

The bill should show the plaintiff's title, and interest in the subject-matter of the suit; and also that the defendant has an interest in the subject-matter, and is liable to answer therefor, to the plaintiff. *Ibid., secs.* 260, 261, 262.

A reference to the bill, which has been fully stated, will show a compliance with the principles above stated.

Conceding that the prayer for an account should be considered as calling for an account, upon the hypothesis that it was the duty of the trustee to rent out the lands and hire out the negroes; and also conceding it was not his duty to do so, but that he had the right, and exercised the right of cultivating much the larger portion of the lands, with the negroes and other trust property; he having rented a small portion of the lands, and received the rents thereof, we think the bill would entitle the complainants to an account for the issues and profits arising from the lands cultivated.

The proof shows, and it is admitted, that a small portion of the real estate was rented out, and the rents received by the trustee; for these the complainants were surely entitled to an account.

If it were conceded that under the special prayer for relief the plaintiffs could not claim the issues and profits resulting from the cultivation management of the trustee, nevertheless, we do not doubt that they may claim them under the general prayer.

The defendants have insisted that there is such an inconsistency between a claim for renting and hiring, and one for cultivation, that inasmuch as the special prayer presents the former, the latter cannot be insisted upon under the general prayer, more especially so, because its language is, "*and* that your orators may have such other *and* further relief," &c. They say that if the complainants could claim the relief they insist upon, under any general prayer, it could only be under one in the *disjunctive.* Perhaps this would be true if the kinds or character of the relief claimed under the two prayers were *essentially different and inconsistent;* and the facts set forth in the bill did not sustain the special prayer. But in this case there are rents to be accounted for under it. Moreover we do not consider that where *cestui que trusts* are claiming from their trustee, rents received by him from a portion of the trust estate, and also the issues and profits, received by him, from the cultivation of other portions of the estate, that such claims are so materially incon-

sistent, as that the issues and profits from cultivation cannot be claimed under such a general prayer as the present.

In *Hoffman's Ch. Prac.*, (*2nd Ed.*,) commencing at page 48, the author treats of special and general prayers for relief. In the notes he has set forth the principles decided in a variety of cases. The weight of authority, in those cases, it is believed, is consistent with the views we have taken in this case.

The defendants rely upon "Account J.U.D.," as an account of the trust, which is to be considered as *prima facie* correct, and as casting upon the complainants the *onus* of showing error in any of the items thereof. And this view was sustained by the court below.

The complainants having excepted to the account, the defendants, in support of their views, have referred to the following authorities. 2 *Fowler's Exchequer Prac.*, 239, (should be, it is presumed, 283 and 284,) *Chalmer vs. Bradley*, 1 *Jac. & Walk.*, 65; *Peyton vs. Green*, 1 *Rep. in Chan.*, 146; *Lewes vs. Morgan*, 4 *Dow's Parl. Cas.*, 30; (same case is reported in 5 *Price*, 42,) *Fitzgerald, Exc'r of Jones, vs. Jones*, 1 *Munf.*, 150; *Settle vs. Alison, et al.*, 8 *Geo. Rep.*, 201; *Allender, et al., vs. Vestry of Trinity Church*, 3 *Gill*, 166. In addition to these cases, elementary works, or books of practice, have also been cited; they, however, it is believed, do not maintain any principles more in favor of the defendants' pretensions than are to be found in the above cases.

In the examination of those cases it should be borne in mind, that "J.U.D." is not an *account stated or settled*, between the trustee and the *cestui que trusts*, or between the latter and the defendants as executors of the former.

The supplemental answer alleges, that this account of the trust was accessible to and often seen by the complainants, George and Elizabeth, and that each of them had expressed themselves satisfied with the correctness thereof. The answer, however, was not called for under oath, nor was it sworn to; and no proof was offered to sustain such an allegation. Moreover, the answer does not state when the com-

plainants, or either of them, admitted the account to be correct; whether before or after arriving at age.

It is alleged in the supplemental answer, that the defendants, upon request, furnished to the complainants, through their solicitor, a copy of the account. But this is stated to have been done in March or April 1854, which was subsequent to the filing of the bill.

The case spoken of in 2 *Fowler's Exchequer Prac.*, 283, is there referred to, as "*Earle of Lonsdale vs. Wordsworth, 28th May*, 1789, *in Scac. M.S.*" An account was being taken before the master, between the plaintiff and the representatives of an intestate who had been steward to the plaintiff; various *vouchers* were produced by the representatives as evidence of payments by the testator, for the use of the plaintiff, but, for want of proving the handwriting of the person who signed the voucher or receipt, the plaintiff's solicitor objected to the evidence of payment, and that the master ought not to receive it. The account being of long standing, and the vouchers of this description very numerous, the master desired to have the directions of the court on this point. The court stated the rule to be: "That in all matters of account, the party who produces the vouchers in support of payments, produces those vouchers at his peril, and the master is bound to admit them in evidence, except the other side can lay a reasonable ground to show that the voucher in question can be impeached, of which the master is to judge, and then to grant a commission to examine into the truth of it, or not, as he thinks proper. And accordingly, the court ordered the master to receive the vouchers as evidence, to proceed, in the account *de die in diem*, and to be at liberty to make a separate report."

The account is stated as being of *long standing*, but how long does not appear. It may have been twenty, thirty, or forty years. The question was not, whether an account, many of the items in which were unsupported by any vouchers, should be received as *primà facie* evidence of the correctness of the whole account, including the items without vouchers; but whether *vouchers* of long standing should be received without proof of their execution.

In *Hoffman's Masters in Chan.*, 82, it is said: "The court will sometimes admit accounts to be *prima facie* evidence for a party, on the ground of great length of time."

This author then makes the following quotation from *Chalmer vs. Bradley*, 1 *Jac. & Walk.*, 65:

"It was to be ascertained what was the value of an estate in the years 1770, 1775, and 1789, for which purpose, its state at the time, the attempts to sell it, and the amount of the rents, were to be considered. The master of the rolls said,—In making the estimate, I think, the master will do right, if any account of the rents and profits have been kept, to take them as *prima facie* fair accounts, subject to any objection that the other party may make to them, so that they may not be precluded from showing, if they can, what the amount really was.

"The next question will be, whether, at any period up to 1789, J.B. was in advance beyond the assets received by him, and to what extent. Here again, I think, it will be very reasonable, if an account was regularly kept of the administration of the estate, that it should be considered as *prima facie* evidence of his receipts and payments, throwing on the other side the *onus* of impeaching it. J. B. was dead."

This case, as reported in *Jac. & Walk.*, shows that, in 1770, Thomas Bradley died, leaving a will, by which he devised to his wife, his brother Joseph Bradley, and two others, portions of his real estate, in trust, to sell so much thereof as should be sufficient to raise such a sum of money as his personal estate should fall short of discharging his debts; and as to the residue, in trust for his children who should be living at his death. He left Thomas, his son and heir-at-law, aged four years; and three daughters, Mary, Elizabeth and Alice; Mary, the eldest, was thirteen, and Alice, the youngest, five or six years of age.

The wife, and the other trustees, were named as executors. The widow and Joseph Bradley proved the will; the others having renounced, and also released the real estate.

At the testator's decease, he owed debts exceeding the value of his whole property; his personal estate being only about

£226. "This statement was contained in the answer in a passage which the plaintiffs were under the necessity of reading in evidence, from its being connected with another sentence made use of by them."

All the testator's real estates were sold by his trustees for the purpose of paying his debts, excepting the estate at Lockwood; which consisted of one-third part of some freehold premises to which the testator was entitled as tenant in common, and which was subject to a mortgage.

Elizabeth Bradley attained twenty-one years of age, and, in 1780, died intestate and unmarried, leaving her brother Thomas her heir-at-law.

In June 1789, about two years after coming of age, Thomas conveyed his right and interest in the estate at Lockwood, to his uncle Joseph; reciting in the conveyance the embarrassed state of his father's affairs; that Joseph has advanced a considerable sum of money out of his own estate, and more than the full value of the estates of the testator remaining unsold, to satisfy the remainder of his creditors; that Joseph had also, at his own expense, brought up and educated him, (Thomas,) had instructed him in business, and had advanced him money to begin and carry on business for himself; that the money so advanced, and what had been paid to the creditors of the testator, amounted to £1300, which sum had been fixed upon as the value of the Lockwood estate, for which the said Joseph was to take it, and have it conveyed to him. It was also recited that Thomas was fully convinced of the justice of the account, and not having it in his power to recompense his uncle, he had requested him to accept the estate then remaining, as was proposed to him by his late mother.

In 1815, forty-five years after the death of the testator, Thomas Bradley, the bill was filed by Alice Bradley, his daughter, and by the surviving husband and son of his daughter Mary. They alleged that the property left by the testator was sufficient for the payment of all his debts, without having recourse to the Lockwood estate, which Joseph Bradley, the trustee, was therefore bound to have conveyed

17    v.15

to the testator's children.    Alice claimed one-fourth of this estate, and another fourth was claimed by the surviving husband of Mary, as tenant by the courtesy, and by her son in remainder.    The bill prayed that the testator's will might be established, and the accounts relating to his estate, if necessary, taken; and the Lockwood estate might be conveyed to the plaintiffs, and the rents and profits accounted for to them, in the proportions in which they were respectively entitled.

It is stated by the master of the rolls, as proved, that Joseph Bradley continued in quiet and undisturbed possession, until his death in 1804; a period of thirty-four years from the decease of the testator.    And it appears that Joseph took upon himself to exercise an act of ownership, by devising the property, by name, as his own.    On his death, his son took possession, enjoyed it as his own, and by his will devised it as his own, to his family.    One share then came into possession of one of his children, who dying in 1814, devised it again.    Thus there were three successive wills, by three successive generations, from 1770 to 1814; during this period the estate was enjoyed by the trustee, and those claiming under him, and no demand of any kind was made upon them.

The master of the rolls then says: "*Thomas Bradley* lived till 1810, suffering great vicissitudes in life; he became a bankrupt; but neither he nor his assignees, persons naturally astute to look into such claims, made any objections, acquiescing, no doubt, from a conviction that Joseph had rightfully purchased the estate, and was the rightful owner of it.    *Alice Bradley* came of age in 1785; she had then the same claim that she now has, yet she lies by, having this right, for thirty years, seeing the estate enjoyed by Joseph and his descendants, augmenting in value, and money being laid out on it, and now desires to have an account *ab initio,* in the same way as if it were a recent claim.    *Mrs. Chalmer* came of age in 1778, five years before her marriage; yet while unmarried she made no claim, and none is made afterwards by her husband or her son until 1815."

The plaintiffs alleged that they had but recently discovered the facts.

Special inquiries were directed, to ascertain whether the plaintiffs had any notice of the circumstances; whether they had in any manner released; and whether the trustee had advanced to the amount of the value of the estate.

It will be seen that the accounts, which the master of the rolls thought it would be right for the master to take as *prima facie* fair accounts, could not have been of more recent date than twenty-six years prior to the institution of the suit, and extending back to 1770. In addition to which, it appears, they were sufficient, in 1789, to satisfy Thomas Bradley, (then representing his own share of the estate, and that of a deceased sister,) that Joseph Bradley had made such advances as justly entitled him to have the unsold real estate of the testator, Thomas Bradley.

The entire case of *Peyton vs. Green,* is thus reported: "This court ordered, that in regard the account in question is of twenty years standing, the defendant shall prove his account by his own oath, for what he cannot prove by books and cancelled bonds; for that after so many years his own oath must be accepted as a proof in this case."

*Lewes vs. Morgan* is thus briefly stated in *Hoffman's Masters in Chan.,* 82 and 83: "There had been various transactions between attorney and client, accounts settled, and securities given upon the foot of them. It was alleged that vouchers had been lost or delivered up, at such settlements.

"The decree upon opening the accounts directed, *that* if, in taking the accounts, it should appear to the deputy remembrancer, that any voucher in support of any article in such account was lost, and could not be found, that the party should make oath that such voucher did heretofore exist, and of the contents, or purport of such voucher, and that the same had been delivered up to the other party."

It appears, from the reports of the case by *Dow* and *Price,* the accounts were of long standing.

In *Fitzgerald, Exc'r of Jones, vs. Jones,* 1 *Munf. Rep.,* 150, the commissioner submitted accounts not so complete as

could be wished; but he thought it might appear rather surprising that they should be as correct as they really were, considering that upwards of twenty-seven years had elapsed since the defendant's testator qualified as his father's executor, as also the situation of the country, produced by the revolutionary war, during the greater part of the time he acted in that capacity; to which might be added his being unacquainted with keeping regular accounts.

After speaking of charges sustained by regular vouchers, the commissioner says, "Many of the others are satisfactory from the affidavits herewith filed; and many of the items could not be expected, from the nature of them, to be accompanied with any vouchers. There are others, for which it is probable vouchers have been taken, but in the confusion of the times may have been lost or destroyed, and which the testator of the defendant, if living, could supply by other testimony, which the defendant cannot procure, not knowing where to apply for it."

· The plaintiff objected to every voucher that was not agreeable to law; and objected to every thing but what the law allowed.

From Chancellor Wythe's opinion it appears, that the defendant's testator had given up the estate, and the management thereof, in August 1782, to one of the plaintiffs, for the use, undoubtedly, not of himself only, but of his other brother also; and that for nine years and ten months thereafter he was not summoned to render an account of his administration. The Chancellor then says: "The plaintiffs are, with *unreasonable rigour*, exacting vouchers, upon failure to produce which are founded many exceptions; especially when to circumstances, noticed by the commissioner, may be attributed loss of papers, and when, too, some debts were of such a kind that, probably, they were incurred because, otherwise, the plaintiff's property might have been sold for satisfaction of public demands, and for services performed on their estates for their benefit."

In *Settle vs. Alison, et al.*, 8 *Georgia Rep.*, 201, a question was made, whether, when a subscribing witness to a

written instrument resides beyond the jurisdiction of the court, the regular mode to prove *its execution,* is to prove the handwriting of the witness.

The court held the receipt properly admissible in evidence, on the ground that it was more than thirty years old, and, therefore, its execution need not have been proven at the trial. They say, "In admitting written documents in evidence, when more than thirty years old, the courts do not go altogether upon the presumption, that the subscribing witnesses are presumed to be dead, but they adopt that limit of time as a rule of practical convenience, beyond which, proof of the execution of written instruments will not be required, although the subscribing witnesses may be alive."

In addition to the age of the instrument, the court mention the fact, that it came out of the hands of the individual to whom it was originally given, and who was properly entitled to the custody of it.

In *Allender, et al., vs. Vestry of Trinity Church,* the Reporter states the following, as principles there decided:

"In a controversy upon an account for work and labor, materials furnished, and money paid, after a lapse of twenty-four years, suit commenced, general proof of the nature and extent of the demand being in evidence, and free from suspicion, much less detailed proof should be exacted from the claimant, than if, immediately after its origin, a controversy in relation to it had arisen."

"Signatures to receipts for money paid, being in possession of the party and his representatives claiming under him, for more than thirty years, need not be proved. They are presumed to be genuine, when they relate to transactions which are established as having occurred in conformity to the receipts, by general and collateral proof."

It is shown by the opinion of the court, that, among the objections urged against the appellants' claim, it was insisted, that the handwriting of each subscriber to the receipts should be proved by competent testimony, before they could be received as evidence of the payments they purport to attest; that after a lapse of more than twenty-five years, this great

particularity and fullness of proof should be required; and that stronger proof should be demanded to sustain the claim, than would have been required had it been the subject of judicial scrutiny immediately after its origin. But the court deny the correctness of these positions, by saying, "we think they cannot be maintained upon any sound principles of reason, law or justice. On the contrary, in our opinion, much less detailed and conclusive proof should be exacted in support of the claim before us, than if, immediately after it originated, the present controversy had arisen."

And again, in relation to the receipts, it is said by the court: "The appellants are under no obligation to prove the signatures to those receipts. Having been in their possession, and that of Dr. Allender, whom they represent, for more than thirty years, as we may fairly presume, these receipts, under the circumstances and for the, purposes for which they are brought before us, prove themselves."

Notwithstanding our very thorough examination of the authorities, we do not think "Account J.U.D." should be considered as *prima facie* evidence of its correctness; and as casting upon the complainants the *onus* of impeaching it. In saying this, we mean, it cannot be so regarded independently of the effect which may result from the agreement of the parties, spoken of as "Agreement No. 2." What effect that should have will be considered hereafter.

None of the cases referred to, held accounts of less than twenty years standing to be *prima facie* evidence. And in most, if not in all, of them, where so held, there were facts, in addition to length of time, entitled to much consideration, in favor of admitting the accounts. Such cases as related to *accounts settled*, vouchers delivered up, and such as present questions relating to what proof is requisite, where vouchers of long standing are in contest, can have but little, if any, influence, in favor of admitting the items, *generally*, in "Account J.U.D." as *prima facie* correct.

The account commences in January 1834 and ends in November 1851. It includes items in each of those years, and in every intervening year.

The suit was instituted in April 1853, not twenty years after the date of the first item, and less than two years subsequently to the last; but a little over four years after the elder *cestui que trust* became of age, and when the younger had been of age about one year.

Many of the charges do not state to whom they were paid. If, from the nature of the articles, they might be supposed to have been purchased for farm use, many of the charges do not specify or indicate for which of the farms they were designed. This may also be said in regard to some items, charged as paid for harvest, and other expenses.

Speaking in reference to the defendants' accounts, based upon "J.U.D.," the auditor says: "It has sometimes been very difficult, if not impossible, to tell whether an item of expenditure was properly applicable to both, or one only, of the *cestui que trusts*—in such cases, the auditor has generally been governed by the direction of the defendants, as to the particular item."

The difficulty of ascertaining to which of the *cestui que trusts* the charges in the account were properly applicable, was one of the objections urged by the complainants. The defendants contended that the trustee could not have separated the expenses of the trusts, showing which were applicable to each beneficiary, and therefore he was excusable for blending them in one account; inasmuch as a portion of the trust estate was owned jointly, and to which of the two children other portions would ultimately belong, depended upon a contingency, which must continue so to be until Elizabeth should arrive at age. But admitting such to have been the condition of the trust estate, still the trustee might, and should, have kept such accounts as to a reasonable degree of certainty might, ultimately, have shown what expenditures were applicable to each part of the trust estates. By which means an equitable adjustment might finally have been made.

It is certainly true, as a general rule, that a trustee should keep separate accounts, as far as practicable, where two or more *cestui que trusts* have separate interests. And, in this instance, the testator has expressly declared that during the

continuance of the trusts created by his will, "the profits of his real estate shall be appropriated to the use of that one of his children, who is entitled to the estate itself under his will."

Not only are the charges against the trust estates blended, but, for the years 1848 and 1849, credits on account of proceeds of crops are so blended as to render it impossible to ascertain, accurately, the proceeds received from each farm. In the auditor's explanation of "Account E.U.D., No. 3," he says: "In 1848 and 1849, crops from Essex and Annamessex are mixed in the charge in Account J.U.D.—the auditor has, by instructions, divided the proceeds equally between the two farms—giving half to E. U. Dennis as the proceeds of Annamessex, and dividing the remaining half between E. U. Dennis and George R. Dennis, as the proceeds of Essex." Such a division is the best which the auditor could have made, in view of such credits; but the division could only be considered equitable upon the supposition, that the crops of each of those two farms were equal. There is, however, no evidence of what the separate crops of each were, except the mixed or blended credits, which only give the aggregate proceeds from the crops of both. The account should have been more definite.

Several negroes were sold, the proceeds of which are not included in the account.

It has been shown that timber, to the value of $888, was cut from the White Haven farm, no notice of which is taken in the account.

In the accounts prepared by the auditor, the allowance to the trustee for taxes paid, the report says, "is according to the vouchers filed, which differ, in some cases, from the amount charged in the Account J.U.D."

The irregular manner of stating this account, with regard to dates, does not furnish intrinsic evidence of its being an original account, kept and stated, from time to time, as the transactions of the trusts were occurring. Although, for the year 1836, some twenty-seven items are charged, amounting, in the aggregate, to $1498.36, no date is given, except the

year, and the month of October, at the beginning. For 1842, there are nearly as many items, and greater in amount, whilst no date is given but the year. Six items are charged under date of 1848, January 1st, then five charges for 1847 are stated, and then the account proceeds with 1848 again. For the following year, charges commence by being dated 1849, after which appear items for 1848, and then for 1849. The dates, as given for 1841, are:—Dec. 1, March, April 1, June, July 10, Aug. 16, Nov., Dec. 7. Beginning and ending with December, notwithstanding the charges in the intervening months.

Proceeds of grain from Essex, White Haven, and Annamessex, for two years, and two years' rent of mills, are credited, being dated as follows: "1838 and 1839, crops—Oct. 10;" no other month being mentioned. Proceeds of grain from the same farms, and interest on State stock, are credited, being dated: "1846 and 1847, Jan'y 1;" having no further date.

It is not necessary to decide the controverted question, whether there is, or is not, sufficient evidence to show that the "Account J.U.D." is in the handwriting of John U. Dennis; for if that fact was clearly established, we should, nevertheless, be of the opinion that the account should not be considered as *prima facie* correct.

The defendants have insisted that the "Agreement No. 2" is such an admission and adoption of the account, as to make it, *prima facie*, a correct account of the trust. But we cannot assent to the propriety of such a construction of the agreement.

In the first place, it admits, *unqualifiedly*, a class of items particularly specified. Exclusive of these, the account contains many others. The first branch of the agreement, therefore, cannot be an admission or adoption of the whole account. After absolutely rejecting two items, one for $200, and the other for $800, then, in reference to the other items charged in the account, the agreement cautiously and fully manifests an intention, simply, to dispense with the necessity of proving the execution of bills and receipts of the *persons*

18      v.15

*to whom payments profess to have been made*, allowing them to have the same effect they would have, and no more, if offered in evidence, and the execution of them proved.

Now, there are a variety of items which do not indicate to whom they were paid. And many of them disclose nothing more than the articles and the prices of them.

It is difficult to perceive how this agreement can have the effect insisted upon by the defendants, especially when it provides, in express terms, that the complainants shall not be understood as admitting any of the items of the account, except those unqualifiedly admitted, "are proper charges against the trust estate, and legal and competent evidence in this cause, or that said account is a proper, or any, account of the trust created by the will."

Whilst treating of *admissions made by the express* AGREEMENT OF THE PARTIES, in order to dispense with other proof, it is said in 3 *Greenlf. on Ev., sec.* 293: "Admissions of this sort *are not to be extended by implication*, beyond what is expressed in the agreement."

In *Alexander's Ch. Pr.*, 125, *sec.* 3, the author treats "*of the evidence required before the auditor.*"

After having stated what is the English practice in taking an account of a trust estate, or of assets in the hands of an executor, it is said: "In this State it is usual to allow the disbursements of an executor, on such vouchers as would be taken by an orphans court. And a trustee is allowed his disbursements upon the production of the receipt, in writing, of the person receiving the payment, and showing the cause or purpose thereof. It is not usual to require from a trustee, or executor, any other evidence of payment than is furnished by such vouchers, unless the fact of payment is denied by an exception filed by the adverse party. In case of an exception taken, the payment must, in general, be proved as on a final hearing. In the case of an executor or administrator's account, this general position is to be taken with some qualification."

The English practice, as stated, is, to allow payments under forty shillings sterling, upon the oath of the defendant

alone; but vouchers are required to prove all payments above that sum. The English authorities show that, when accounting before the auditor, the defendant is to be allowed, on his own oath, sums not exceeding forty shillings each, he must mention to whom paid, for what, and when, and he must swear positively to the fact, and not to his belief only, and the items so to be allowed must not exceed £100. 1 *Vern.*, 283, *(case* 281, *Anonymous.) Ibid.*, 470, *Whicherly vs. Whicherly.* 2 *Ibid*, 176, *Marshfield vs. Weston.* 2 *Atk.*, 410, *Robinson vs. Cumming.* See, also, *Hoffman's Mas. in Ch.*, 82. 2 *Johns. Ch. Rep.*, 501.

*Whicherly vs. Whicherly* was decided in 1687, and in reference to allowing the accountant's oath, the court "declared *that* rule seemed very unreasonable, and would consider how to rectify it."

As no such oath is here made, and could not be, it is needless to consider the propriety or applicability of it. The particularity which is required, although the sums included in it are so small, is the reason why it has been thus far noticed.

If an account, so irregularly kept, and subject to so many objections as we have stated in regard to the one before us, although professing to be in the handwriting of the trustee, who died between one and two years prior to the institution of the suit, should be admitted as *prima facie* correct, and as casting the *onus* on the *cestui que trusts* of impeaching it, by showing its errors, it would be establishing a precedent which would afford trustees the opportunity, either by design or by great negligence, of subjecting *cestui que trusts* to great injustice, leaving them but little opportunity of correcting errors in the account. How would the present plaintiffs be able, with any degree of tolerable success, to investigate and ascertain whether those numerous charges, which do not indicate to whom paid, are or are not correct? How, by means of the account, can they ever accurately adjust the blended charges or the blended credits?

It is rarely, if ever, the case that a trustee cannot procure and preserve vouchers. He may also, apply to a court of

equity, in case of minors, with whom he cannot account, and there administer his trust.

We are not to be understood, by any of the preceding remarks, as intending even to intimate that the trustee, J. U. Dennis, designed to do any injustice to his brother's children.

In consequence of believing that the trustee was bound to rent the land and hire the negroes, the testimony offered by the plaintiffs was chiefly designed to show the annual value of rents and hire. In view of what has been said by us, it will be proper, when the case goes back, that they should furnish proof of the net annual proceeds of those portions of the real estate which were cultivated by the trustee. From the nature of the matters to be proved, the evidence cannot be very exact. The best evidence, therefore, which, from the nature of the subject of inquiry can be expected, should be furnished. Farmers of experience, who have been acquainted with the lands for a long time, may be permitted to give their opinions of the probable annual products of the crops, and, also, of the probable annual expenses necessary for cultivating, securing, and getting them to market; considering that the farms were cultivated and carried on by the trustee, with the negroes and other personal property belonging to the trust estate. The quantity of arable land in each farm, and the quality thereof, may be testified to by witnesses acquainted with the lands; and upon such evidence farmers of experience may give their opinions of the probable annual products, as also of the annual expenses. Of course, those who have an actual knowledge of the products of any year may speak of them. Some evidence should likewise be given of the market prices of such crops in each year, as were usually raised on those farms.

The products should be abated by the amount of the crops necessarily used by the negroes, also by the horses and other kinds of stock on the farms. Old and infirm negroes, and those too young to labor, must, necessarily, tend to increase the amount to be abated from the probable gross amounts of products. The trustee should not be made

answerable for more than the probable net proceeds arising from sales of the crops, after deducting all necessary expenditures on account of the trust, including in these the wages to overseers, replacing of horses and mules, which may have died, and replacing worn out farming utensils.

If the plaintiffs should rely upon the proceeds of crops, as stated in Account J.U.D , they will admit in evidence against them, the charges against the trust estate in that account, unless they are discredited or disproved by the testimony in the cause. *Allender, et al., vs. Vestry of Trinity Church*, 3 *Gill*, 173.

In addition to the class of items, in that account, unqualifiedly admitted by "Agreement No. 2," it also admits, that other items charged in that account shall have the same effect as if the bills and receipts of the persons to whom the *payments profess to have been made,* were offered in evidence, and the execution of the receipts proved. This admission is sufficient to charge the trust estate with all such items as were properly applicable to the purposes of the trust, which show to whom they were paid, and the cause and purpose thereof.

The items admitted under this provision of the agreement, which relate to ordinary and usual annual expenditures for farming operations, should not be added to, but deducted from, the general estimates of such annual expenditures as may be made by witnesses who may testify in relation thereto; unless the items thus admitted by the agreement are taken into consideration by such witnesses in their estimates.

In the inventory, corn and oats are appraised, the number of bushels being given as follows:

"1360 bushels of corn, at 60c.    -    -    -    -    -    $804.00
75 bushels oats,    -    -    -    -    -    -    .    -    18.75"

Immediately after these items, the inventory contains the following appraisement of crops:

"Estimate of crop at White Haven,    -    -    -    -    -    $321
Estimate of crop at Annamessex,    -    -    -    -    -    -    267
Estimate of crop at Essex, including tenants,    -    -    4,250

$4,838"

The inventory is dated the 29th of May 1833, and returned the 11th of June following. As the will appears to have been made on the 26th of March, and proved on the 7th of May 1833, the testator must have died between those dates.

In view of the circumstances, we are induced to believe that the crops appraised by "estimate," without stating any number of bushels, were the crops growing at the time the inventory was prepared.

The aggregate amount of the inventory is credited to the estate of the testator in the first administration account, including, therefore, all the grain and crops as appraised; and yet in neither account of the administration is there any allowance to the executor for grain or other provisions consumed by the negroes, horses, or other stock, during the year 1833, or for expenditures of any kind, whilst cultivating, securing or getting to market the crops of that year.

There is no proof, nor has it been pretended, on the part of the complainants, that those crops were of greater value than the amount of their appraisement; and the defendants have insisted that they yielded much less than the estimates put upon them.

The crops appraised by "estimate" were not included in the list of sales, but we suppose they were subsequently sold. The nature of such property, and the uniform custom of the country, authorize such a supposition; especially when it is recollected that the will gave authority to John U. Dennis to sell any part of the personal estate given to him in trust for the children of the testator.

The list of sales was returned on the 20th of August 1833. At that time the corn crop was not matured, and the other crops, most probably, had not been prepared for market at so early a period after harvest. It cannot be imagined that such property remained on hand, specifically, for any considerable length of time. At all events, those crops are not now in existence, and therefore cannot, either be delivered up to the complainants or exposed to sale. And if the complainants require the defendants to account for the value of the crops in money, then the amount by which the disbursements are

shown to exceed the assets in cash, appearing by the exhibits from the orphans court to have been received by the executor, should be considered a fair set-off, *pro tanto*, against the estimated value of said crops. By "Statement B," the complainants virtually concede the propriety of doing very much the same thing. In the administration accounts and the distribution, all the disbursements, including the excess over the assets in cash, are deducted from the credits given to the estate, including the amount of the inventory, the gain on sales with the interest thereon, and sperate debts as returned. The balance of estate, then appearing to be distributed to the trustee, is the sum of $20,189.74$\frac{1}{2}$.

The corrected "Statement B," designed to show the amount of personal property other than negroes, distributed to the trustee, is as follows:

"Amount distributed to John U. Dennis, upon
  trust, for the use of the children, Elizabeth and
  George, as per distribution made 10th of March
  1842, - - - - - - - - . - - - $20,189.74
Deduct difference between $629.64, as
  accounted for in 2nd administration
  account, and $524.22, amount ac-
  tually received, - - - . - -   $125.42
  Less 5 per cent. commission, - -    6.25
                                         119.15

                                        20,070.59
Deduct value of negroes included in amount dis-
  tributed to trustee as above, - - - - - - 13,671.00
Leaving balance of personal property distributed
  to trustee, - - - - - - - - - - - - $6,399 59"

The exhibits of copies from the proceedings in the orphans court will show that the disbursements allowed the executor, for debts paid, for expenses of administration and for pecuniary legacies, amounted to considerably more than the money which came to his hands on account of property returned as sold in the list of sales, the interest thereon and the sperate

debts returned. It is true, as the plaintiffs' counsel have said, that such payments exceeding the amount of cash appearing to have been received by the executor, could not transfer to him, in his own right, the title to any portion of the testator's property. But it is equally true, that whenever a court of equity is called on to pass a decree, recognising the correctness of the above proposition, care will be taken to provide that the executor shall be reimbursed, out of the testator's property, for all proper disbursements on account of the estate appearing to have been legally made by him; especially when they have been passed upon and allowed by the orphans court, and no evidence has been offered tending to impeach them.

In *Hall vs. Griffith,* 2 *H. & J.,* 483, specific property was held for many years, by the administrator, he considering it his own, because he had overpaid the creditors the amount of the inventory. But the court decided, that such overpayment gave him no right to retain the property at the appraisement; and compelled him to account for the same; including negroes, their hire and increase. It was held, however, "that he should be allowed all sums of money necessarily expended by him in clothing and maintaining such of the negroes, named in the inventory, as were not able to work and maintain themselves, and in bringing up, maintaining and clothing, the increase of any of the negroes, so long as they continued a charge. That he should also be allowed all sums of money paid by him to the creditors of the deceased, his commissions, and all legal costs and charges." The doctrine of that case is approved by the court, in *Haslett's Adm'r d. b. n., vs. Glenn,* 7 *H. & J.,* 22.

By comparing the inventory with the list of sales, "Statement D" professes to show what property, exclusive of negroes and legacies, included in the inventory, had not been returned in the list of sales. By an examination of that statement, we find, that the property appearing by the list of sales not to have been returned as sold, includes horses, mules, cattle and other stock, farming utensils, kitchen

iture, some rails, a small quantity of plank and shingles; also, corn, fodder, bacon, pork, wool, 1340 bushels of corn and 75 bushels of oats, amounting in the aggregate to $4008.64. For this amount we do not think John U. Dennis should be held answerable, unless it may be for such portions thereof, (if any,) as may be shown to have been sold by him. It is but a just and reasonable inference, from the circumstances in the case, that this property was held by him to be used on the farms; that considerable portions thereof were, *necessarily*, consumed, during the year 1833, whilst the crops of that year were being cultivated, secured and prepared for market; that other portions perished, and some were worn out by use, during the continuance of the trust. Moreover, it is admitted, that in the year 1850, when the trust estates were delivered up to the *cestui que trusts*, there was received by them, with their farms, personal property, exclusive of negroes, amounting to $3010.00, then remaining on their farms.

After deducting the sum of $4008.64 from the balance of $6399.59, taken from "Statement B," there remains a balance of $2390.95 of personal property, exclusive of negroes, for which J. U. Dennis should be held to account. He is entitled, however, to a deduction therefrom for so much of the crops of 1833, as must necessarily have been seeded for the crops for the next year. And if it can be shown, by proof, that in addition to the 1340 bushels of corn, and 75 bushels of oats, heretofore mentioned, more corn and oats were actually necessary for the use of the negroes and the stock on the farms, before the crops of the year 1834 were sufficiently matured to be used, then so much corn and oats as were necessary for the purpose above stated should be allowed out of the crops of 1833, and therefore should be deducted from the balance of $2390.95, in addition to the allowance or deduction on account of grain for seeding.

After what has been said, it is scarcely necessary to add that, considering, as we do, the crops of 1833 as having been appraised in the inventory as personal assets, no other charge should be made against John U. Dennis on account of the

crops of that year, in any account of the trust which may hereafter be taken; except the above balance of $2309.95, when the same shall be reduced by such allowances as we have intimated may be shown to be proper. Upon the balance so reduced the *cestui que trusts* are entitled to interest from the 7th of August 1834.

For all negroes mentioned in the inventory, or their increase, who were sold by the trustee; and for all those, (if any,) who were living at the termination of the trust, and who may not have been delivered up to the *cestui que trusts*, the plaintiffs are entitled to claim compensation, including interest from the time of sale, where sale has been made.

We concur with the judge below, in the propriety of refusing to charge compound interest upon any portion of the trust estate. But, we think, the *cestui que trusts* should be allowed simple interest upon the excess of annual products of the estate over the annual expenses. Such allowance of interest, upon each annual excess, to commence at the end of one year after the accrual thereof.

The defendants filed, as evidence, the following statement:

"About the spring of the year 1853 or 1854, in the course of dealing with George R. Dennis, son of Littleton U. Dennis, deceased, I received from said George, in payment of a sum of money due me from him, a certificate of State of Maryland five per cent. stock, amounting, as well as I can recollect, to a small sum over two hundred dollars—on which, I think, there was interest due, but to what amount I cannot state. The certificate, I think, was to the heirs of Littleton U. Dennis, deceased, and had endorsed upon it an assignment to me, signed by the said George and his sister, Mrs. Elizabeth U. Dennis. I understood from conversation with the said George, that the certificate was for damages to the real estate of the said heirs, by reason of the Eastern Shore Rail Road running through it, and that he had received it from the executors of his deceased uncle, John U. Dennis.          ISAAC D. JONES."

It was agreed that this statement should "be received and

taken as if Mr. Jones had been sworn and examined before the auditor, and had made the statement under such examination, liable to all such exceptions as it would be if it had been so taken."

The complainants excepted, objecting to the reading of the same as evidence, because irrelevant and not material to any of the issues.

Inasmuch as the plaintiffs have not made any claim for State stock, and the statement shows they were the rightful owners of the certificate received by them from the defendants, we think the exception to the evidence should have been sustained.

The defendants have excepted to the averments of the bill, as not being sufficient to sustain a claim, on account of cutting and selling timber from any portion of the lands of either of the *cestui que trusts.* This exception should have been sustained. There is no express allegation or charge of cutting and selling timber. The complainants state, "that they were very young at the death of their father; that they have very little personal knowledge of the manner in which their uncle conducted and managed the trust estates, or of the care he took of the same, or in what condition he found the same at the time he took possession thereof, but they have been informed and believe, that when it came to the hands of the said John U. Dennis it was in fine order and condition, and productive; and they charge, that during the continuance of the trust it was greatly impaired in value; and when the same came to their hands, since the death of the said John U. Dennis, they found their land in bad condition and unproductive, the buildings dilapidated and decayed, and the whole estate greatly wasted and injured; and they charge that the said John U. Dennis did not use proper care and diligence in preserving the same; and they insist they are entitled, and ought to receive compensation, for all waste and decay arising from such want of care and diligence."

Such language seems designed to charge that the estate had been impaired, injured, decayed or wasted, in consequence of the neglect, want of proper care and diligence on

the part of the trustee, or because of his careless and negligent management of the estate, rather than as having resulted from waste, committed or authorized by him, by cutting and selling timber, or by any such act.

The complainants' counsel have insisted, that, supposing there are not sufficient allegations in the bill to authorize a decree for the amount claimed for the timber cut, yet, for the purpose of doing justice, inasmuch as the money for the timber has been traced to the trustee, the court should consider that such money as the trustee paid for G. R. Dennis, during the trust, had been paid out of the proceeds of the timber. In support of this suggestion, reference has been made, to *Ringgold vs. Ringgold*, 1 *H. & G.*, 74. But that case, differs, materially, from this. There the court say: "It appears from the evidence in the cause as furnished by the answers of these defendants, (see their various accounts filed as exhibits, to their answers,) that Samuel Ringgold has received the sum of $1117.83, part of these sales, and that Tench Ringgold has received the residue from the different purchasers. Samuel Ringgold has applied the sum thus received to debts of the estate, and Tench Ringgold has paid debts and made disbursements to a considerable amount after the sales of the personal property. We shall therefore consider, so far as Tench has, *after the sales of the personal property*, paid debts and made disbursements for the estate of Thomas, that they were made from such receipts. For all the residue of Tench's receipts, which will be unexhausted by such an application, and for the amount of his own purchases at the sales of 1807, all of which remains uncollected, accountability must be sought by the complainants in a new, proceeding."

These receipts, on account of those particular sales, made by the trustees, were held not to be covered by any allegations in the bill, and that a decree could not be passed against the trustees for the amount of those sales. But, for the purpose of doing equity between the parties, the course set forth in the above quotation was adopted. It will be seen, however, that the facts which induced that action of the court

were disclosed by the *answers of the defendants.* In the case before us the bill contains no sufficient averment in regard to the cutting of timber; and the defendants have filed exceptions to the bill on that account. The answers are silent on the subject; and exceptions to all the complainants' evidence in support of the claim, have been filed.

When a cause is remanded, under the Act of 1832, without the reversal or affirmance of the decree, the case stands in the court below as if no appeal had been taken, and the decree appealed from had not been passed, but the opinion expressed by the Court of Appeals, on points made before that tribunal, or which may be presented by the record, is to control and regulate the subsequent proceedings in the cause.

Having fully set forth our views in relation to the important questions which have arisen in this case, and by which it must be regulated, very differently from the former proceedings, it is not deemed necessary to notice all the numerous exceptions filed.

The defendants' exceptions to evidence were properly taken, and should have been sustained to the following extent:

So much of Nos. 1, 3, 6, 10 and 11, as relate to cutting of timber.

The bill contains no sufficient averment on this subject. Besides which, those portions of the testimony of witnesses given upon information derived from conversations with other persons, would not be admissible.

Such part of No. 2, as excepts to the statement of James J. Moore, that he "had understood the mill rented for fifty dollars per annum."

The portion of No. 4, which relates to the statement of Samuel S. Boggs, "that the lands were considered productive."

The complainants' exceptions to evidence, Nos. 1, 2, 3, 4, 5 and 6, were well taken, and were correctly sustained by the court below.

Nos. 7 and 8 of their exceptions, relate to the "Account J.U.D," concerning which enough has been said:

The various statements and accounts which were made by the auditor, "in accordance with the instructions of the respective parties, not only in the general principles upon which they were stated, but also in the details," did not require exceptions. They were subject to objections if no exceptions to them had been filed. It will be recollected the auditor says, that "by the terms of the reference he was not required to state any account upon his own responsibility, or according to his own views and discretion, but only to follow the instructions of the parties." And the limits of the duty thus assigned him, he says, have not been transcended by him.

*Cause remanded for further proceedings,*
*without reversing or affirming.*

(Decided January 12th, 1860.)